**Stein v. General Motors Corporation**

*Alan D. Williams, Jr.,* for plaintiff.

*Peter P. Liebert,* for defendant General Motors Corporation.

*James R. Bowen,* for defendant Reedman Motors, Inc.

BODLEY, J., April 17, 1972.—This is an accident case in which plaintiff was injured when he lost control while driving his wife's car on the Pennsylvania Turnpike. The car veered to the left across an unguarded medial strip, rolled over two or more times and came to rest against a barrier on the opposite side of the highway. Suit was brought against the manufacturer and seller of the vehicle. At the conclusion of plaintiff's case, the trial judge granted defendants' motion for an involuntary nonsuit and the court en banc later dismissed plaintiff's motions for new trial and to take off the nonsuit. Thereafter, plaintiff appealed to the Superior Court. This opinion is written as required by the rules of that court.

Plaintiff's theory of liability was that of strict liability under Restatement 2d, Torts, §402A. The facts offered in support of plaintiff's claim are rather uncomplicated. On January 24, 1964, plaintiff was operating his wife's vehicle at a speed of approximately 55 to 60 miles an hour in the left or "fast" lane of the Pennsylvania Turnpike. It was daylight and the roadway was dry. According to plaintiff and the testimony of some of his passengers, the car was felt to swerve or wiggle slightly to the right at which point,

he testified, plaintiff turned his steering wheel to the left resulting in no immediate response, but a moment thereafter there came a sudden swerve to the left. From that point on it appears that plaintiff had lost all control of the vehicle.

The car in question was purchased in November of 1961 and at the time of the accident, some 26 months later, registered 17,700 and more miles on its odometer. Approximately one week prior to the accident, plaintiff had the vehicle inspected by a friend who operated an establishment named "Abe's Auto Repairs." The vehicle passed inspection. However, immediately after inspection, plaintiff "felt the steering wheel going to the left too far." He stated that this worried him to the point that he went upon a parking lot in order to test the steering mechanism and on this occasion he felt that the wheels turned too far to the right as well as to the left when he turned the steering wheel but slightly. The car had power steering, although the one that plaintiff customarily drove did not.

Plaintiff testified that he took the car to defendant, Reedman Motors, a few days later in order that the steering might be tested and that he rode with a "road tester" who stated that the steering mechanism worked perfectly. He did not drive the vehicle between this date, said to have been Monday, January 20th, until the date of the accident, Friday January 25, 1964. Plaintiff was not aware of how much his wife may have used the car during this interim period, but she had reported no problem with the steering mechanism. Immediately prior to the accident in question, plaintiff had driven for some 20 to 25 minutes on the turnpike at a speed of approximately 55 to 60 miles per hour. He experienced no trouble with the steering mechanism during this time.

Following the accident, plaintiff told an investigating State Trooper that the steering seemed hard to control at the moment of the accident and that he lost control of the vehicle. He said that was all he knew about the accident. He was not sure if he had applied his brakes at the time.

The investigating officer found skid marks of some 39 feet in the medial strip and testified that the vehicle had been "totalled" as a result of the impact. Pieces of the vehicle were strewn about the highway. After the injured persons were taken from the scene, the vehicle was towed to a nearby garage where it was examined the next day by a mechanic and the investigating officer.

The mechanic who looked over the car the following day with the trooper testified, among other things, that the left-front ball joint assembly was apart or separated. Later on, one Walter VanNess Pruyn, who described himself at trial as an "Impactologist," looked over the vehicle on two occasions, February 10, 1964, and July 11, 1964.

At the trial of the case, the court sustained objections to questions which sought to elicit from Mr. Pruyn his opinion as to whether the ball stud of the upper left ball joint suspension system was in the ball joint socket at the time of the accident or not. The court also sustained an objection to questions which sought his opinion as to the cause of the separation of the ball joint assembly and as to his opinion concerning whether or not the design was defective. This witness did, however, describe in detail the physical operation of an automobile steering mechanism and described in minute detail his findings respecting the parts and pieces of this vehicle after the accident. The opinion sought of the witness by plaintiff's counsel was kept out of the case because

the trial judge believed that Mr. Pruyn did not have the requisite qualifications to permit him to express opinions on the subject matter of the inquiry.

Examining the qualifications of Mr. Pruyn, it is noted that he is not a physicist, metallurgist or a mechanical or civil engineer. He graduated from high school in 1923 and took courses in education at the University of Pennsylvania during the years 1934 through 1949, in which latter year he was awarded a Bachelor of Science degree. Of the 125 semester hours of study at the university, 24 of these were said to have represented credit in mechanical engineering. The witness's practical experience included work as a salesman and later, as he put it, "production engineer" for a family firm known as "Pruyn Ball Bearings" which was in the business of the manufacture and remanufacture of ball bearings and subsequently that of automotive parts wholesaler.

The witness began to teach automotive mechanics at Philadelphia high schools on a part-time basis in 1935 and in 1936-37 taught for two years at Philadelphia vocational schools. Thereafter, he, in his words, was a "regular" high school teacher until the war years when he was called upon to set up certain maintenance procedures for military vehicles. He testified that he developed such procedures for a tank division in Detroit. Following the war, he became associated with Spring Garden Institute, a technical school in Philadelphia, where he taught courses dealing with maintenance. During this period, he went to Turkey, for a time, as a representative of the United States for the purpose of instructing Turkish mechanics upon the maintenance of military equipment given that country by the United States. He then returned to Spring Garden Institute as a director of automotive training. However, he taught psychology

and English during the period of 1957 through 1965 and did no teaching in the automotive field.

The witness has taken no courses since 1949 in subjects relating to engineering and never took courses beyond the high school level in the field of physics. He never studied or instructed in the field of automotive design.

Since 1965 Mr. Pruyn has spent full time as a consultant and professional witness in accident cases, doing business under the registered name "Associated Technical Consultants." It appears that he has no full time employes or others associated with him. As noted before he described himself as an "Impactologist" and declared that he is the only "Impactologist" in the United States.

He also testified that the term "Impactologist" had been conceived by himself and that he has registered the word at the United States Patent Office, although the purpose thereof was not made clear.

In Mr. Pruyn's words, the name represents the nature of his activity; that is to say, the analysis of "the results of impact, the degree, angle, depth of penetration and all of the other evidence associated with accidents, to reconstruct the accident and determine the approximate speed of vehicles prior to impact and the result of the impact based on the paths taken by the vehicles during the process of impact." This would appear to be his avowed area of expertise along with, of course, the automotive maintenance field. As noted earlier, his entire association with the automotive field related to maintenance and the teaching of automotive maintenance.

In the opinion of the trial judge, this witness was not qualified to express an opinion relating to the possible improper design of the steering mechanism

of the particular vehicle involved, nor an opinion relating to the qualities of the metals used in its upper ball joint assembly. Accordingly, while Mr. Pruyn testified at great length concerning his findings and concerning the intricacies of the operating features of the steering mechanism and ball joint assembly, his opinion concerning automotive design and metallurgy, whatever it may have been, was kept from the jury and we think rightfully so. Considering the witness's qualifications, the trial judge felt that any "opinion" offered by Mr. Pruyn on the points of inquiry would be in the nature of a guess offered under the guise of expert opinion. See Laubach v. Haigh, 433 Pa. 487, 491 (1969).

The technical nature of the inquiries was quite different from the nature of those put to the police officer who qualified as an "expert" in the case of Flavin v. Aldrich, 213 Pa. Superior Ct. 420 (1968), and who was permitted to express the opinion that brakes were defective by reason of loss of fluid *prior* to the accident. See also Andrews v. Jackson, 211 Pa. Superior Ct. 166 (1967), in which it was held to be error to receive the opinion of an officer, who had not witnessed the accident and who had tested the brakes of the vehicle in question *after* the accident, that the driver was unable to stop because of brake failure. The court there held that the officer was competent to testify only as to the condition of the brakes at the time he tested them, that is to say, after the accident. And this, we think, is the situation with respect to Mr. Pruyn. He was competent to testify as to the facts which he found after the accident and this he did. We did not believe that he was competent to express an opinion as to the *cause* of the accident. His opinion was ruled out not because of a lack of

*formal* education in the subject matter, but because of the absence of the requisite knowledge no matter how acquired.

Plaintiff in this case was attempting to do just that which our Supreme Court held improper in the case of Smail v. Flock, 407 Pa. 148, 151 (1962). In that case, defendant offered testimony of a witness, described as a heavy equipment appraiser, to prove that defendant's truck capsized because of a defective or broken spindle. The tractor-trailer involved had failed to negotiate a curve and had overturned. In his offer of proof, the defense counsel suggested that the testimony would explain the reason for the turning over of the tractor-trailer. The court in upholding the exclusion of this testimony through Mr. Justice Musmanno, stated, inter alia, at page 152:

"The offer carried so many conjectures, speculations and hypotheses that any conclusion based on the answers would have been entirely extraneous to the law of cause and effect. In the first place, it was not asserted that the broken spindle, if there was one, accounted for the overturning of the truck, nor even that the spindle was broken before the tractor-trailer entered into the curve. The offer did not exclude the possibility that the spindle snapped because of the intolerable strain placed upon it as the result of the centrifugal force generated as the truck hurled itself into the turn at a high rate of speed. Nor did it exclude the possibility that the spindle may have broken when the truck was righted after the accident, or when it was taken off the highway."

The court went on to quote from the case of Sweeney v. Blue Anchor Beverage Co., 325 Pa. 216 (1937), saying:

"No matter how skilled or experienced the witness

may be, he will not be permitted to guess or to state a judgment based on mere conjecture."

Such, we believe, would have followed the permitting of the "Impactologist" to offer the sought-after opinions in this case.

Also offered by plaintiff was the opinion of a highly qualified metallurgist who examined the left upper ball joint assembly and who gave both judge and jury a very sophisticated but understandable and interesting dissertation upon metals and their properties. Without question, this witness was extremely well qualified to testify within the field of his competence and was permitted to do so. However, after explaining in a general way how any ball of the nature of the one under consideration might come out of any socket, the witness acknowledged that he had performed no metallurgical tests upon the ball and socket in question, that is to say, upon the "retaining plate" as it was called, which permitted the ball to separate from the socket. He frankly acknowledged that he scrutinized the same carefully and, in true professional style, acknowledged that he was unable to state that the condition of the metal, as he examined it, was the same at that point as it was at the time of manufacture. The ultimate question to this witness was objected to and the objection was sustained. His opinion was sought first as to whether the metal socket in question was strong enough to retain the ball in question and secondly, as to the effectiveness of the design of the ball and socket for the purpose intended.

The witness quite frankly acknowledged that he had no qualification in automotive design and no experience or competence in that field. He acknowledged that he had no design experience what-

soever with respect to balls and sockets. For these reasons, although his description of the metals he had scrutinized, which made up the ball and socket, are found in the record, the trial judge felt that to permit counsel to elicit from him an opinion as to design and the appropriateness of the metal in question for use in a ball and socket in an upper ball joint assembly, would be improper. It was believed that such opinion would be outside of the witness's field of competency and, once more, in the realm of conjecture.

As noted heretofore Mr. Pruyn was highly qualified by way of his practical experience in automotive maintenance and, hence, was fully competent to testify as an expert in that field, there being no magic in formal education vis-a-vis practical knowledge acquired through actual experience. See Abbott v. Steel City Piping Co., 437 Pa. 412 (1970). The metallurgist was an expert in his field both by way of formal education and by way of practical experience. But he had not analyzed the particular metal in question and, had he done so, his opinion in the area sought, except as to particular defects found in the metal parts, would have been unacceptable by reason of his lack of qualification in the area of automotive design. Lacking as he did knowledge of design, the principles of physics involved, and the various counter-acting mechanisms which relieve stress upon the ball and socket in question, his opinion as to desirable composition and strength would have been theoretical conjecture.

It was pointed out earlier that plaintiff proceeded upon the theory of strict liability under section 402A of Restatement 2d, Torts. That theory is articulated at pages 347 and 348 as follows:

(1) "One who sells any product in a *defective*

*condition unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer *without substantial change in the condition in which it sold.*

(2) "The rule above stated . . . applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." (Italics supplied.)

The burden upon plaintiff in these so-called strict liability cases is to prove that the product in question had been defective when it left the hands of the seller and that it was unreasonably dangerous to the ultimate user or consumer at *that* time. He must further prove that there was a causal connection between the defect and the accident. This may be established by either direct evidence or by way of inference drawn from circumstantial evidence. See Forry v. Gulf Oil Corp., 428 Pa. 334, 340 (1968). It is not essential that a specific defect be proved to establish 402A liability: Bialek v. Pittsburgh Brewing Co., 430 Pa. 176 (1968); MacDougall v. Ford Motor Co., 214 Pa. Superior Ct. 384 (1969); Greco v. Buccioni Engineering Co., Inc., et al., 283 F. Supp. 978 (1961). But a plaintiff cannot depend upon conjecture or guesswork. The mere fact that an accident happens, even in this enlightened age, does not take the injured plaintiff to the jury. However, under this theory of liability, a plaintiff is *not* required to prove that either the manufacturer or the seller was negligent. Defend-

ants are held liable under proper circumstances even if they exercise all possible care. And no consideration whatsoever is given to the ordinary theory of negligence. See Bialek v. Pittsburgh Brewing Co., supra, at page 185.

Nonetheless, it is essential that it be proved that there was in existence at the time the product left the possession and control of the manufacturer or seller a "defect" such as is contemplated by the Restatement. And it is essential that it be established that the product reached the complaining consumer or user without substantial change in the condition in which it was originally sold. It is not necessary that the defect, if any, existed at the time of manufacture or sale in the particular form to which it had developed, if it did, immediately before an accident. Yet the initial legal defect must be proved to have existed in fact. Quite obviously, if there be imperfect metal which breaks under normal use, it does not necessarily give way immediately. See Dunham v. Vaughan and Bushnell Mfg. Co., 37 L. W. 2456 (Ill.). However, lapse of time and metal fatigue which naturally follows continued use may create an inference that the product was not defective when sold. The longer the use, the stronger the inference may be. Normally this is a jury question. However, see Arrow Transportation Company v. Fruehauf Corporation, 289 F. Supp. 170 (1968) (Ore.).

A seller is not liable when he delivers a product which is in a *safe condition* and which, through subsequent mishandling, or as a result of other causes, becomes dangerous when used. See Comment G, p. 351, Restatement 2d, Torts, §402A. This theory of liability specifically contemplates that a seller may not be held responsible for damages growing out of alterations or a modification of the product constitut-

ing substantial change: Speyer Inc. v. Humble Oil and Refining Company, 403 F. 2d 766, 771 (1968). The manufacturer and seller, it must be remembered, are not insurers that no injury will result from the use of the product. The doctrine of strict liability must be confined solely to situations where there is evidence of defective conditions which were in existence at the time the product left the hands of the manufacturer or seller, and which conditions are found to be unreasonably dangerous to the user: 13 A.L.R. 3d 1057, 1066 (1967).

One of the problems here relates to the age of the vehicle in question and to the prior usage and, as well, as to the history of the steering problem having developed immediately following its "inspection" at "Abe's Auto Repairs." Webb v. Zern, 422 Pa. 424 (1966), which incorporated the 402A theory into the law of Pennsylvania, followed the lead of other States which recognized that an injured user of a defective product was often at an extreme disadvantage when he sought recovery for his damages. If he thought in terms of pursuing the matter on the theory of breach of warranty, he ofttimes ran into the obstacle of his not being in privity of contract with the seller and hence was foreclosed. When he sought to recover on a negligence theory, he was, likely as not, unable to establish the fact of negligence on the part of the manufacturer and certainly not upon the seller or distributor.

Webb v. Zern, supra, and following cases were born of reasonable necessity. However, one should turn to the facts of the various cases which have been considered by our appellate courts. For example, Webb v. Zern, supra, dealt with the spontaneous explosion of a keg of beer which had been bought the same day. In Ferraro v. Ford Motor Co., 423 Pa. 324 (1966), the

front wheel of a truck driven only 500 miles locked, causing the accident. In Greco v. Buccioni, supra, the product involved was a sophisticated, specially built piece of machinery. Bialek v. Pittsburgh Brewing Co., supra, dealt with the spontaneous explosion of an unopened beer bottle. Forry v. Gulf, supra, related to the explosion of a newly purchased tire, the day after the purchase. Burbage v. Boiler Engineering and Supp. Co. Inc., 433 Pa. 319 (1969), had to do with an admittedly defective boiler replacement valve which malfunctioned, causing the boiler to explode. Berkebile v. Brantly Helicopter Corp., 219 Pa. Superior Ct. 479 (1971), concerned the defective design of a new helicopter on which only 198 ½ hours of air time had been logged. MacDougall v. Ford Motor Co., supra, dealt with the failure of the steering mechanism of a new automobile driven only 143 miles.

It will be noted that these cases reasonably and logically call for the application of the 402A principle. In most of them, the products were new and the injured user or buyer was one who would have every reason to believe, along with an objective observer, that the product in question left the manufacturer and seller in a condition "unreasonably dangerous to the user." There would be every reason to believe that the product underwent no substantial change between the times of manufacture or assembly and of sale, and the time of the accident. Other strict liability cases related to complex and sophisticated machinery where, again, 402A has a logical application, e.g., Greco v. Bucciaoni, supra. But as noted heretofore 402A does not turn a manufacturer or seller into an insurer. Nor does it permit every driver who loses control of his vehicle a right of action against the manufacturer and automobile dealer.

We think that, under the evidence offered in this

case, to permit a jury to speculate that the accident grew out of defective manufacture or defective design would be straining toward the point Mr. Justice Paxson referred to in Hoag v. Lakeshore and Michigan Southern Railroad Co., 85 Pa. 293, 298 (1877), when he said:

"There is a possibility of carrying an admittedly correct principle too far. It may be extended so as to reach the reductio ad absurdum, so far as it applies to the practical business of life."

MacDougall v. Ford Motor Co., supra, is particularly significant in the context of the facts of this case. While that case dealt, as noted heretofore, with the failure of a steering mechanism of a *new* automobile, the emphasis was on the word "new." The case held that mechanical malfunction in itself, with regard to a new automobile, was evidence of a defective condition without proof of the specific defect in the design or assembly which might have caused the malfunction. In such case, there is no need for expert testimony. But, again, the court was referring to a vehicle which, unlike the vehicle driven by the present plaintiff, was not 26 months old nor driven 17,700 miles and was one which had not been in the hands of untold numbers of automobile mechanics. Rather, the court's discussion related to a machine driven only 143 miles. Clearly, in MacDougall, there was a patent "absence of abnormal use." MacDougall referred to the case of Henningsen v. Bloomfield Motors Inc., 32 N. J. 358, 161 A. 2d 69 (1960), as a "leading case" in the products liability field and pointed out:

"As in the instant case (MacDougall) an automobile accident resulted from the failure of the steering mechanism of a *new* automobile." (Italics supplied.)

Flavin v. Aldrich, supra, a pre-Webb v. Zern case,

was decided upon ordinary negligence law and involved the purchase, in 1963, of a 1958 automobile. The accident occurred when the brakes failed *one-half hour* after the purchase from an automobile dealer. Section 402A was not the law of Pennsylvania at the time of the accident. The court emphasized that the automobile was sold "upon representation that it was in good condition," but that it nevertheless was found to be malfunctioning only one-half hour after the sale. In the case there was also testimony from an automotive expert that the brakes had been defective prior to the accident. Under this set of facts the court stated at page 426 that there was ". . . nothing in the record which would suggest that the vehicle had been altered or changed in the *brief period . . .*" between the sale and accident and went on to say that this was sufficient evidence of negligence to permit a verdict *against the automobile dealer* to stand.

However, the troublesome aspect of Flavin is found in dictum contained in a footnote on pages 426 and 427 wherein the opinion writer called attention to the words of the trial court, apparently with approval, when that court said that if the case had been a post-Webb v. Zern matter, plaintiff would have been entitled to a charge that the dealer would have been strictly liable, regardless of negligence, if the jury found that defendant had sold the car in a defective condition, citing Ferraro, a case which dealt with a new truck. If this dictum were the present state of the law under 402A no automobile dealer could possibly risk selling a car which is not in new condition, for no matter how carefully he might have his mechanics crawl over, under and through the vehicle, any five-year-old car, regardless of its prior use, or abuse, if involved in an accident wherein there is a loss of control due to a mechanical defect could be the

subject of a jury's conjecture as to its condition at the time of manufacture. If there were any mechanical failure in this hypothetical five-year-old car, the jury would, under this dictum, determine whether there had been a defect, dangerous to the ultimate user or consumer, which existed in design or assembly at the time the car left the assembly line. The question comes to mind, of course, as to the 10-year-old car, the 15-year-old-car? It would seem to this writer that a plaintiff must do more than prove that he was injured by or in the defendant's product. He must prove that a defect existed before the product left possession of the manufacturer and that the defect itself was the actual proximate cause of the injury. Strict liability should not be translated into absolute liability. Manufacturers and sellers should not be held liable for injuries growing out of ordinary wear or deterioration of the product. Of course, a question always exists as to whether deterioration is brought on by the so-called "ordinary wear and tear" of time alone or by actual defect in the first instance; and if the latter is true, the manufacturer should not be exculpated. But hard evidence, direct or circumstantial, must be offered. Proof of loss of control and conjecture as to the cause thereof is not enough.

Relating the foregoing discussion to the facts of this case, it is our opinion that plaintiff has not met his burden to prove that the vehicle was in a defective condition at the time it left the hands of the seller, by either direct or circumstantial evidence. If the steering mechanism was in fact defective in any way, the likelihood that such defect grew out of mishandling of the car at "Abe's Auto Repairs" is much more compelling than that it grew out of any original defect at the time of manufacture or, behind that, of design.

It must be remembered that the first history of

"over-steering," if this is what plaintiff's claim is, as it seems to be, followed immediately after his having received the car from the inspection station. There was no history of any steering problems or steering deficiencies prior to that time. The only reasonable conclusion is that this 26-month-old car on which 17,-700 miles had been logged was in a *safe condition* at the time it left the manufacturer and seller and that subsequent handling of the car is what made it harmful to plaintiff, assuming the accident in question was actually caused by mechanical defect rather than by operator failure or inattention. See Restatement, 2d, Comment to §402 A, p. 351.

Great contrast is noted between the facts of this case and the other 402A defective brake and defective steering mechanism cases cited above, just as there is no relationship whatsoever between the circumstances of Mr. Stein's mishap and those accidents which related to the exploding beer keg, exploding beer bottle, the defective boiler valve and others of similar nature. When the steering mechanism of a new car locks and causes the vehicle to run wild, when the container in apparent new condition bursts, there is little likelihood of tampering or intermediary damage between manufacture, sale and the accident. Just so, in the case of a new vehicle having mechanical malfunction there is no need to specify the defect. There is no need for expert testimony on that score. However, in the case of the old vehicle such as that of Mr. Stein, as the vehicle ages there is an in-.creasing unlikelihood of original defect. And, most particularly, in the case before us, one cannot escape the obvious fact that the steering mechanism gave difficulty only immediately following the inspection, noted above, at hands other than either of these defen-

dants. In such case, when strict liability is relied upon under 402A there is certainly need of expert testimony to pin down the alleged original sin. Plaintiff was unable to offer qualified testimony in support of his rather unique theory.

Mr. Stein felt the car pull to the right as he put it, or perhaps it hit a bump, as one of the passengers testified. And whether by inattention or as a result of his basic unfamiliarity with the properties of power steering, his reaction to pull to the left quite likely overcompensated for the slight turn to the right. Since he was proceeding in the left or fast lane, he was immediately alongside the medial strip and at the high rate of speed he was travelling, the split second reaction of the car to the tug on the wheel quite likely caused the multiple roll of the vehicle and the ultimate crash against the retaining barrier. When a vehicle is subjected to such shock as that which follows the crash described in the testimony here, it takes no expert to accept the probability that pieces of the machinery will pull apart, be broken and dented. We think that this is what happened in this unfortunate accident.

Plaintiff theorized, but was unable to prove, that the metals used in the retaining plate surrounding the ball were not of the quality, or did not have the properties, which they should have had to retain the ball in its proper place in the socket or, alternatively, that the retention plate was not of a proper diameter to hold the ball. No one with competency in the field of automotive engineering and design was produced to support this theory. Nor was a metallurgical examination of the metal presented to indicate any inherent weakness or defect in the metal itself. As in Woods v. Pleasant Hill Motor Co., 219 Pa. Superior Ct. 381,

386 (1971), plaintiff attempted but failed to establish the alleged defect as the proximate cause of the accident.

For all of these reasons, the trial judge was of the opinion that plaintiff had failed to meet his burden of proof and that submission of the case to the jury upon such evidence would be tantamount to permitting the jury to guess whether or not a defect, in fact, existed at the time the product left the hands of the manufacturer and seller.