Woods, Appellant, *v.* Pleasant Hills Motor Company et al.

Argued April 15, 1971. Before WRIGHT, P. J., WAT-KINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Randall J. McConnell, Jr.* and *George M. Weis,* with them *Herbert Bennett Conner,* and *Dickie, Mc-Camey & Chilcote,* and *Weis & Weis,* for appellants.

*Murray S. Love,* with him *Sikov and Love,* for appellees.

OPINION BY MONTGOMERY, J., September 21, 1971:

Clarence D. Woods, deceased, was killed at about 12:15 p.m. on July 14, 1965, as the 1965 Ford truck he was driving downgrade loaded with various metal products weighing six to seven tons failed to negotiate a curve to the left at the bottom of a hill known as Dellslow Hill on West Virginia State Route No. 75, near Dellslow, West Virginia. The truck left the paved portion of the highway, collided with a pole on the left side, then crossed the road and ran into the hillside on the right and overturned.

At the time of the accident the decedent was employed by Charles Bluestone Company, Inc., a dealer in scrap metal, and was operating the truck in the regular course of his employment. The employer had purchased the truck, consisting only of chassis and cab, on February 15, 1965, from Pleasant Hills Motor Company. It had been manufactured by the Ford Motor Company and it had been delivered to the Pleasant Hills Motor Company on February 12, 1965. After purchasing it Bluestone had the floor or bed and sides built thereon, which took about six to eight weeks, after which the truck was put in service and continued to be used regularly until the day of the accident.

A suit in trespass was filed by Marie P. Woods as administratrix of the estate of Clarence D. Woods, her deceased husband, against Pleasant Hills Motor Company and Ford Motor Company for damages under the Wrongful Death Act of April 15, 1851, P. L. 669, 12 P.S. §§1601-1604, and the Survival Act of April 18, 1949, P. L. 512, art. VI, §601, 20 P.S. §320.601. Subsequently, the two original defendants filed a complaint against decedent's employer, Charles Bluestone Company, Inc.

The case was tried before Hon. Silvestri SILVESTRI, Judge, and a jury. The jury returned a verdict against both Pleasant Hills Motor Company and Ford Motor Company in the amount of $52,515, in the Wrongful Death action and $37,485 in the Survival action. A compulsory nonsuit had previously been granted as to Charles Bluestone Company, Inc., the additional defendant, from which action no appeal has been taken.

Following the return of the verdicts, motions for a new trial and for judgment n.o.v. were filed by both original defendants and refused. Prior to the time the court charged the jury, Pleasant Hills Motor Company had filed a motion, that the jury be instructed to the effect that, in the event of a verdict against Pleasant Hills Motor Company, there must be a verdict over in favor of Pleasant Hills Motor Company and against Ford Motor Company, which was also refused. From the entry of judgments in accordance with the verdicts, these appeals by Ford Motor Company and Pleasant Hills Motor Company followed.

This action was brought on alternative theories, i.e., common law negligence and strict liability under Section 402A, Restatement 2d, Torts, both based on an alleged defect in the braking mechanism of the truck, causing its brakes to malfunction, with the accident as a result. Both theories are based on the failure of the Ford Motor Company to properly manufacture or assemble the braking mechanism and on the failure of Pleasant Hills Motor Company to inspect or properly inspect the fitting on the brake mechanism that was alleged to have been defective and that both defendants sold the truck in that condition. The alleged defect concerns an air line or hose by means of which the braking mechanism was put into operation. It was the plaintiff's contention that the air supply line between the reservoir (reserve) tank and the foot

valve (brake pedal) had become disconnected due to insufficient tightening of a nut, which condition existed at the time the truck was sold to Bluestone.

Although appellee predicated her case on both the theory of negligence and the theory of strict liability under Restatement 2d, Torts, §402A, the sole basis of the claim is the alleged fault in not tightening the nut on the air hose. The negligence alleged relates solely to that facet of the case, i.e., Ford manufactured and sold the truck in that condition and Pleasant Hills Motor Company sold it in that condition without proper inspection to detect the alleged defect. It is unlike *Forry v. Gulf Oil Corporation*, 428 Pa. 334, 237 A. 2d 593 (1968), wherein not only fault in manufacturing a tire was alleged but also negligence in mounting it on the rim.

The rule of strict liability set forth in Restatement 2d, Torts, §402A, was adopted for this Commonwealth in *Webb v. Zern*, 422 Pa. 424, 220 A. 2d 853 (1966), and has been followed thereafter. It provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

The burden of proof that the product was in a defective condition at the time it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which supports the conclusion that it was then defective, the burden is not sustained. Comment g to §402A, Restatement 2d, Torts.

In *MacDougall v. Ford Motor Company*, 214 Pa. Superior Ct. 384, 257 A. 2d 676 (1969), this Court held that evidence of a mechanical malfunction of the steer-

ing apparatus of a new automobile driven only 147 miles before the accident, in the absence of abusive use, could be the basis for inferring that a defective condition of the automobile was the proximate cause of the accident, and was sufficient to sustain the plaintiff's burden of proof. In the present case the plaintiff has elected not to prove any malfunction but, on the contrary to establish the defect as the proximate cause of the accident. The appellants question the sufficiency of the proof offered by the plaintiff to establish these facts, i.e., defect and causation.

Appellants jointly contend that the lower court erred in (1) admitting certain photographs which were offered to show the condition of the truck immediately after the accident, (2) in admitting opinion evidence as to the cause of the accident, (3) in failing to explain properly testimony given by Police Officer Richardson, and (4), in not granting a new trial for the reason the verdict was against the evidence or the weight of the evidence.

In addition to the foregoing contentions, Pleasant Hills Motor Company contends that the lower court erred further, (1) in instructing the jury that it could be held jointly and concurrently liable with appellant Ford Motor Company and (2), in not instructing it that in the event of a verdict against Pleasant Hills Motor Company there must be a verdict over in its favor against Ford Motor Company.

In the absence of any testimony to show the condition of the air lines as they existed before the accident, plaintiff endeavored to establish that fact by offering various photographs taken subsequent to the accident[1] and the testimony of experts based in part on those photographs.

---

[1] In appellees' brief it is stated, page 12, "They were introduced solely for the purpose of depicting the condition of the brake lines and fittings in question."

Appellants first assign as error the admission of the photographs marked Plaintiff's Exhibits 3, 4, 5, 6, 7, and 8. In order to understand the circumstances under which these photographs were taken, it is necessary to review the history of the truck following the accident. Mr. Richards testified that with his towing equipment he affixed cables to the truck and righted it, thereby raising it from its side to its wheels; he then disconnected the battery cables and possibly the drive shaft, towed it to an open field in the vicinity, where it remained for four days until he towed it to Mr. Bluestone's lot in McKeesport, Pennsylvania. The truck remained in an open lot in its demolished condition until about August 20, 1965, when it was sold to Mr. Ours. Mr. Ours removed a rear axle, which freed the wheels from the transmission, permitting it to be towed freely on its wheels, and towed the truck over fifty miles to his lot in New Brighton, Pennsylvania. Mr. Ours proceeded then to dismantle it. He removed the body, then the cab, including most of the air lines. That was done in part with an acetylene torch to sever it from the chassis. He sold the rear axles and three tires and removed parts of the engine (damaged valve covers and fan blade), as well as the broken steering column. He later rebuilt the truck into a "wrecker" and sold it at a later date.

Although the exact dates on which the photographs were taken were not definitely established, it appears that they were all taken several months after the accident. Mr. Ours identified Exhibit 3 as showing the scene in his yard several months after he had removed the cab; and it seems undisputed that Exhibits 5 and 6 were taken on February 22 or 23, 1966. However, the testimony of Mr. Ours and Mr. Fenchel (both plaintiff's witnesses) is at variance as to whether the cab had been removed from the chassis at that time.

The law is well established on this subject. "Whenever the condition of a particular place or thing at a certain time is in question, evidence of its condition at a prior or subsequent time is admissible if accompanied by proof that it has not changed in the meanwhile. On the other hand, if it appears from the circumstances that the condition of a thing or place at another time would afford no just criterion of its condition at the time to which the inquiry relates, evidence of condition at such other times will not be received." I Henry Pa. Evid. §33 (4th Ed. 1953).

"A photograph must be verified either by the testimony of the person who took it or by another person with sufficient knowledge to state that it fairly and accurately represents the object or place reproduced as it existed at the time of the accident, or if there is a difference or change, the difference or change is specifically pointed out and is readily capable of being clearly understood and appreciated by the jury: Taylor v. Modena Borough, 370 Pa. 100, 87 A. 2d 195; Beardslee v. Columbia Township, 188 Pa. 496, 41 A. 617." *Nyce v. Muffley,* 384 Pa. 107, 111, 119 A. 2d 530, 532 (1956), cited with approval in *Vanic v. Ragni,* 435 Pa. 26, 254 A. 2d 618 (1969).

In applying this law to the facts of this case we conclude that these photographs had no probative value to establish the fact in issue and the offer of same into evidence should have been refused. The only issue to be resolved was whether the nut over the ferrule on the line supplying air to the braking system had been so insufficiently tightened when the truck was manufactured and sold that it resulted in the line becoming disconnected as the brake was being operated on the day of the accident, which was over five months after it had been manufactured and sold. Recognizing that an inspection of the line immediately following the acci-

dent might have some evidentiary value to determine whether the line had become disconnected by reason of a loose nut or whether it had been torn loose by the forces present during the accident, we are constrained to conclude that under the circumstances evidence of the condition of the line or lines several months later would afford no just criterion of its condition at the time to which the inquiry relates. Although plaintiff has offered some testimony of a negative nature, that nothing was done to the lines from the time of the accident to the date of the photographs, the affirmative evidence is to the contrary. Mr. Ours testified he severed 90 percent of the line in cutting the cab away from the chassis. There is also evidence that both lines were disconnected immediately following the accident, and also contradictory evidence[2] that only one was disconnected, thus indicating that in fact conditions had been changed. Also to be recognized are the effects of the weather on exposed metals and other materials, which must be considered in our determination of the admissibility of the photographs. A photograph must fairly and accurately represent the object reproduced as it existed at the time of the accident. The differences in this case are too great for a jury, or for anyone in fact, to clearly understand. Therefore, we hold that the lower court abused its discretion in admitting plaintiff's Exhibits 3 through 8, for the purpose for which they were offered. They were not offered to show general physical aspects of the situation but of demonstrating a particular condition at the time of the

---

[2] Mr. Phillips, the tower, testified that the steering wheel was torn out, the truck was in gear (which gear he was unable to say) and that the brake lines (both) were hanging down. The fact that both lines were disconnected and hanging down is confirmed by defendants' Exhibit B taken the morning after the accident when the truck was still in the open field to which it had been moved by Mr. Phillips.

happening of the episode involved. Under the circumstances, they cannot be interpreted as doing so. Under *Flynn v. Chester*, 429 Pa. 170, 239 A. 2d 322 (1968), it was error to admit them for this purpose and the lower court abused its discretion in admitting them.

Appellants next assign as error the admission into evidence of the expert testimony and opinions of plaintiff's witnesses, Dale Fenchel and Wilbert Messmer, for the following reasons: (1) Messmer based his testimony and opinion on the photographs 3 to 8, which were not admissible; (2) neither Fenchel or Messmer qualified as experts; (3) they assumed facts not in evidence or warranted by the evidence.

Since we have concluded that the aforesaid photographs were inadmissible, we must initially determine to what extent the witnesses assumed facts as shown on the photographs. There is no doubt that Messmer did base his opinion partly on the exhibits. In the hypothetical question put to the witness, he was asked: "Q. . . . I am going to ask you to assume that the photographs marked as Plaintiff's Exhibits 5, 6, 7, and 8, and the Exhibit No. 2, and Defendant Ford Exhibit C represent that which they purport to represent in the photos; . . . Assuming those facts to be true, sir, are you able to reach an opinion? A. May I look at the photographs? . . . Yes, sir. Yes, sir." (Record pages 462a and 464a.)

Fenchel examined the truck at Ours' lot on February 21, 1966, at which time, he testified, the cab had not been removed from the chassis. He re-examined it at a later date after the cab had been removed. Although he referred to the aforesaid photograph in explaining his findings, his testimony was based on his personal inspection of the truck and its braking system and not on the photographs.

Without reciting the qualifications of Messmer and Fenchel, we are satisfied that they had sufficient general experience to qualify as experts in this field.

However, we agree with appellants that Messmer based his opinion not on facts which were properly in evidence but rather on facts acquired from an examination of the photographs, as indicated by Messmer's cross-examination: "Q. What condition of that line did you assume, or use from your examination of Exhibit 7? A. The copper tubing part on both lines, yes, sir, I examined both lines and they were both—neither one of the lines were properly tightened. I examined both of them, but this is the particular line that I was interested in. (Indicating) Q. How do you know that neither one of the lines was properly tightened, Mr. Messmer? A. Because there is no indentation on either line. Q. Because there is no indentation on either line that you can see in a photograph taken February 22, or 23, 1966? Is that correct? A. Yes, sir. Q. Right. You don't know what has happened to either one of those lines from February, the date of the accident, July 14, or June 14, 1965, until those pictures were taken, do you? A. No, sir, I don't. I was asked to assume that they were in the same condition. Q. You were asked to assume that both lines as shown on Exhibit 7 were in the same condition when this photograph was taken as on the date of the accident immediately following the accident? A. Yes, sir." (Record, pages 542a and 543a). Thus, his opinion must be excluded from our consideration of this case. *Murray v. Siegal,* 413 Pa. 23, 195 A. 2d 790 (1963); *Andrews v. Jackson,* 211 Pa. Superior Ct. 166, 235 A. 2d 452 (1967); *Moyer v. Ford Motor Company,* 205 Pa. Superior Ct. 384, 209 A. 2d 43 (1965). Fenchel, on the other hand, did not venture an opinion as to the cause of the accident but admitted frankly that the condition he found on his examination of the lines in February, 1966, could have been caused by the force of the accident: [Cross-examination] "Q. Now, you knew this truck has been in an accident? A. Yes, sir. Q. And the damage that you saw,

particularly on the front end, was evidence of a severe jolt or damage? A. Yes, sir. Q. Severe enough for that line to pop out? A. Possible, possible. Q. Possible? This truck having been in an accident, you don't know what caused the line to pop out A. Now, don't— THE COURT: Speak up, Mr. Fenchel. A. (The witness) It is a—no, it don't sir. BY MR. WEIS: Q. All right. It could have been a twist of the frame, or hitting something, or the accident, itself? A. Possible." (Record, pages 355a and 356a.)

An expert's testimony must be stronger than stating a possibility; it must be an assertion that in his professional opinion the result in question came from the cause alleged. *Smail v. Flock*, 407 Pa. 148, 180 A. 2d 59 (1962).

Appellants' next assignment of error concerns the explanation given by the lower court to the jury of the testimony of Officer Richardson, relating to marks of tires skidding found near the scene of the accident. That officer arrived at the scene about 15 minutes after the accident. He testified that the weather was cloudy and dry; the road was asphalt, two cars in width, and at the point of the accident there was a slight upgrade in the direction from which the truck came for fifty yards, then a larger upgrade for 800 feet, then around three curves an increased upgrade for 200 feet more, then an "S" curve, at the end of which was a straight stretch. He took photographs, one of which, Exhibit 14, showed where skid marks of the accident vehicle first started and Exhibit 12 showed where they ended. Those photographs were offered without objection. By Officer Richardson's measurements, the longest skid mark, running from east to west, was 157 feet 4 inches. In explaining Exhibit 14 as to shadows, in questioning by the plaintiff's attorney, he said: "Q. If I understand what the shadow is, that would be where the wheel first starts to grab and starts off light and then the

tire mark would gradually get darker as the brakes held more strongly. Is that correct? A. Yes, sir, this is correct." (Record, page 150a.) "Q. Now, there are other skid marks indicated on these photographs. Can you tell us, did you measure those other skid marks as well, sir? A. No, sir, these were not measured since they were in the same skid mark group, indicating, apparently, that they came from the same vehicle, and only the longest skid mark is measured. Q. Did you examine the skid marks, themselves? A. Yes, sir, I did. Q. What did you determine in your examination of the skid marks? A. That these were fresh skid marks, due to the fact that at the heaviest point of contact of the tire against the asphaltic road I was able to remove rubber from the asphalt where the tire was applied, the brake was applied and the tire pressure was put against the road. Q. Can you tell us whether or not the skid marks that you examined were following the curvature of the road or not? A. Yes, sir, they were. Q. So that they followed it, as indicated in the photograph, there is a curve there at this point? A. Yes, sir. Q. And they seem to follow the curve right around? A. Yes, sir." (Record, pages 152a and 153a.) "Q. And you determined, as I understand your testimony, that there were fresh rubber marks? A. Yes, sir. Q. You also found, if I understood you correctly, flakings or portions of rubber on the tire marks or skid marks that you measured? A. Yes, sir. Q. You also found that the tire marks or skid marks followed the curvature of the road? A. Yes, sir. Q. That you measured the skid marks and they measured some a hundred and fifty-seven feet four inches? A. Yes, sir. Q. Did they lead in the direction of the path that was taken from your investigation in your determination of the accident vehicle? A. Yes, sir. Q. And in your estimation and determination, were they caused or made by the accident vehicle? A. Yes, sir." (Record, pages 159a and 160a.)

394

Later in the trial, Mr. Fenchel, on cross-examination, was asked: "Q. Assuming the truck was not overloaded and assuming that he laid down enough rubber to make clear marks of a hundred and fifty-seven feet—. A. Right. Q.—would you not conclude from that that he had good brakes? A. Right." At this point plaintiff's attorney objected "because there is no showing yet in that question that the skid marks indicated it came from the brakes or from any other cause." (Record, page 341a.) Then a heated discussion occurred among the several counsel and the court before the jury during which the court stated: "According to my notes and my recollection, gentlemen, no one, no witness testified that the rubber, the skid marks, came from braking. Officer Richardson said that they were fresh because he was able to remove rubber, and the marks followed the curve of the road." (Record, pages 342a and 343a.) There was an adjournment for the purpose of reviewing the testimony of Officer Richardson, when it was found that the officer had made a reference to the brakes of the truck making the marks. The objection to the question was overruled; however, to overcome any prejudice to the appellants by the statement made in the jury's presence by the court, the trial judge proceeded to address the jury, as follows: "After checking the record, it was found that there was reference made in a question by Mr. Love to the witness and an answer by the witness to Mr. Love's question to 'brakes', and that is all we are going to say about it, and you are not to take from this explanation to you any undue emphasis to that portion of the testimony. You will recall all the testimony." (Record, page 351a.)

Mr. Weis, counsel for Ford, objected to the insufficiency of this explanation and stated that the issue was whether the officer had testified that the marks had been made by the application of brakes. Again the court asserted its recollection, Record, page 353a: "THE

COURT: Technically, the trooper didn't testify to any application of brakes. He said the brakes grabbed—." There was disagreement again. Mr. Weis denied that the witness had made the statement and Mr. McConnell said, "He used the word 'applied'." The court then concluded, "Well, we aren't going to go any further on it." Reference to the excerpt from the testimony previously read confirmed that the officer did use the word "applied".

Ordinarily we would not give much consideration to such a disagreement as to what a witness may have said, since it is the perogative and duty of the jury to recall the testimony. However, in the present case, since it involved such a critical issue, whether there was a brake failing, we cannot ignore it completely, particularly in light of the emphasis resulting from the insistence of the trial judge of the correctness of his recollection. Under the circumstances, we must conclude that appellants' cause was prejudiced to some extent as a result of the unfortunate discussion in open court before the jury.

Finally, appellants contend that the verdict was against the evidence or at least the weight of the evidence. We are constrained to agree. Although the appellee, as verdict winner, is entitled to have the evidence viewed in a light most favorable to her, giving her the benefit of all favorable inferences that may reasonably be deemed therefrom, and it is for the jury to resolve conflicts in oral testimony, we are led to the inevitable conclusion that the facts established by plaintiff's own testimony are such that they weigh most preponderately in appellants' favor.

The issue is whether the appellants sold this truck in a defective condition unreasonably dangerous to the user. There is no controversy over the fact that, except possibly for the six-to-eight-week period during which he had a suitable body constructed on it, the purchaser

used it regularly thereafter without incident or any indication of any defect or malfunction until the day of the accident. On the day of the accident, it was operating normally, according to plaintiff's witness Dave, who was operating the truck which preceded the one in question down the Dellslow Hill. According to Dave, who was operating his truck in fourth or low gear down this hill, using his brakes only occasionally by tapping them, the decedent, after coming within range, was seen by Dove to be preserving a normal distance between the two trucks until they reached the last turn on the hill, when the truck of decedent suddenly left the road and overturned in the manner previously described, leaving the unanswered questions, whether that was caused by a malfunction of the truck or by the driver's mismanagement of the vehicle. As previously stated, there being no evidence of malfunction, we are limited to a consideration of the evidence as to a defect in the construction of the truck as a cause of the accident. The only evidence that a defect existed is that which was offered to show that there was no mark on the copper tubing forming part of the brake line, which was offered to show a loose nut on the fitting. This has been fully discussed previously. The only evidence that such a defect was the cause of a brake failure is the testimony of two persons who were near the scene at the time of the accident and who testified that they heard a "shhhh" sound as the truck reached the last curve.

This is, in our opinion, slight compared with the other evidence forming part of plaintiff's case as to the demolished condition of the truck following the accident, the testimony of Mr. Phillips, the tower, as to the condition of the two lines immediately after the accident, the skid marks left by the application of the brakes of the truck as it rounded the curve, and the use of the truck for five months without incident after it was sold, all of which indicates there was no defect in

the brake mechanism and that the accident was due to some other cause.

Therefore, for the reasons hereinbefore discussed, the erroneous admission of the photographs, Exhibits 3 to 8, the inclusion of their consideration by the expert witness Messmer, the unfortunate incident between the court and counsel regarding the skid marks and the fact that the verdict is contrary to the great weight of the evidence, a new trial will be required to ensure justice being done.

In light of this conclusion we need not consider further the negligence feature of the case or the question of liability over.

Judgments reversed and a new trial awarded against Ford Motor Company and Pleasant Hills Motor Company.