463 F.2d 675
 Theodore KACZMAREK, Administrator of Estate of Charles R.
Cook, Deceased, Appellant,
v.
MESTA MACHINE COMPANY, a Corporation, and The McKay Company,
a Corporation, Defendants and Third-Party Plaintiffs,
v.
JONES & LAUGHLIN STEEL CORPORATION, a Corporation,
Third-Party Defendant.
 No. 71-1601.
 United States Court of Appeals,
 Third Circuit.
 Argued May 1, 1972.
Decided June 30, 1972.
 
 John M. Crimmins, Koegler & Henderson, Thomas W. Henderson, Pittsburgh, Pa., for appellant.
 Henry E. Rea, Jr., Brandt, McManus, Brandt & Malone, Pittsburgh, Pa., for appellee Mesta.
 Vincent J. Grogan, Duff, Grogan & Graffan, Pittsburgh, Pa., for appellee McKay Co.
 Before VAN DUSEN, GIBBONS and JAMES ROSEN, Circuit Judges.
 OPINION OF THE COURT
 JAMES ROSEN, Circuit Judge.
 
 
 1
 On September 26, 1967, appellant's decedent Charles H. Cook was killed while working at Jones and Laughlin ("J & L") Steel Corporations' Pittsburgh Works, when a load of steel being treated in a pickler machine[1] was upset and fell on him. Suit was filed against the manufacturer of the pickling machine, Mesta Machine Company ("Mesta"), and The McKay Company ("McKay"), manufacturer of a replaceable component part, i. e., a chain, which together were alleged to have malfunctioned due to a design defect, resulting in Cook's death.[2] A jury trial commenced on April 28, 1971 and ended on May 5, 1971. At the conclusion of the plaintiff's case the court directed a verdict for the defendant McKay. The jury verdict[3] was for the defendant, Mesta.
 
 
 2
 *****
 
 
 3
 * * *
 
 
 4
 The steel fell from a loading rack which was part of the pickler machine designed and sold by Mesta to J & L in 1937.[4] The chain used on the pickler was made of monel metal[5] and had been purchased from McKay in 1964 or 1965. Testimony reveals that McKay's first transaction with J & L for monel chain followed a request from J & L on February 20, 1964 for a quotation on eight monel chains per J & L drawing No. A-27249, Mark B, referred to as plaintiff's exhibit 1(b) during trial.[6] McKay replied that its standard monel chain and the only one available at that time was one inch diameter stock having an interior diameter of 1 1/2 inch by 4 inches.6A The chain depicted in the drawing had a 1 inch stock and an interior diameter of 1 3/4 inch by 3 5/8 inches. J & L submitted a purchase order6B for eight chains as specified in McKay's quotation.6C A second purchase order was submitted by J & L on March 22, 1965 for eight additional monel chains.[7]
 
 
 5
 Appellant's case rested on a reconstruction of the accident which depended wholly on expert testimony. There were no witnesses as to what caused the loading rack[8] to turn over. Joseph A. Haller, called by plaintiff as an expert witness, stated that in his opinion "* * * this accident was caused by the dangling chains engaging one of the lugs on the carrier plate [loading rack] and tilting the carrier so that the plates thereon were tilted over and flew out like, as one demonstration would say, as a deck of cards being tossed."
 
 
 6
 Haller admitted that he did not examine any of the chains in use on the machine at the time of the accident or the loading rack involved in the accident.[9] Plaintiff's expert, Robert H. Ramey, also testified that he examined one chain which he selected from the sixteen chains that were on the pickling machine at the time of the accident.[10] Ramey testified that after making various configurations with the chain links corresponding to the changing attitudes of the links during the pickling operation, he discovered that one of the smaller links on the chain would completely engage the 3 inch by 6 inch flange of the loading rack.10A
 
 
 7
 McKay's sales manager, Carey, testified that the links of the chain McKay shipped to J & L had interior dimensions of 1 1/2 inch by 4 inches and that the opening of a chain link of the assembled chain was reduced to two inches by the one inch stock of the two interconnecting links. This testimony was uncontradicted.
 
 
 8
 Appellant rests its case squarely on the contention that the pickling machine, with McKay's chain attached, malfunctioned due to the presence of a design defect, and that such malfunction should have been reasonably foreseen by both Mesta and McKay. The trial judge directed a verdict for McKay since it could find no proof that the chain as a chain was defective. In Tomao v. A. P. De Sanno & Son, Inc., 209 F.2d 544 (3d Cir. 1954), we held that "[i]f a manufacturer owes a duty to use due care in making his products, he owes also the companion duty to warn of the latent limitations of even a perfectly made article, the use of which, however, is dangerous if the user is ignorant of those limitations and the manufacturer has no reason to believe that he will recognize the danger."[11] This holding acknowledges the Restatement rule regarding chattels known to be dangerous for intended use. We also emphasize that the fact that a standard chain was used does not automatically relieve the maker of liability, if that standard creates a reasonable likelihood of harm. However, these theorems do not afford a sounder basis for appellant's liability claims.
 
 
 9
 Appellant's decedent had been employed by J & L for a number of years. He was not unfamiliar with the pickling process. This operation was not free from the hazards accompanying employment around heavy duty equipment, steel sheets and acid. Additionally, it was a commonly known fact that the chains used to submerge the steel into the acid for cleaning would gradually become worn due to corrosion and would require replacement. No evidence is present in the record going to the specific nature of the defect in the chain. In fact, appellant's expert Ramey admitted that a chain link with a one inch density, as supplied by McKay, and having the internal dimensions contained in J & L's purchase order, would not allow the 3 inch flange to pass through. The chains examined by appellant's experts had been in use for some two years after purchase. Clearly, there was no duty on the part of McKay to furnish a chain that would not wear out. Common sense dictates that there should be frequent if not periodic inspections and replacement of the worn parts as soon as they are detected. Under the facts of this case that duty rested upon the decedent's employer. There reposes no duty on the manufacturer, absent a contract, to provide servicing, maintenance and replacement of worn parts. Nor is the manufacturer under a duty to guard against any injury which results from wear and deterioration of parts.
 
 
 10
 This case must be distinguished from those cases where there is a malfunction of a recently acquired machine with a latent defect. These chains were in service for an extended period. When tested by the experts, one of the links was found to have suffered a 30% reduction in volume. Assuming that the appellant's reconstruction of the accident is correct, liability does not automatically follow unless the appellant satisfied his burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller.[12] The record simply compels the conclusion that the malfunction, if any, of the pickler was not due to inherent design or manufacture but was probably due to factors such as improper use or abuse.[13] Damage sustained during abnormal use of a product is not evidence of defect. Berkebile v. Brantly Helicopter Corp., 219 Pa.Super. 479, 281 A.2d 707 (1971), pet. for allowance of appeal den. Nov. 22, 1971.
 
 
 11
 The duty of the manufacturer or supplier is limited to foreseeing the probable results of the normal use of the product or a use that can reasonably be anticipated. Prosser, Torts 667 (3d ed. 1964); McLaughlin v. Sears, Roebuck & Company, 281 A.2d 587 (N.H.1971). While the rule requires the evidence to be viewed most favorably for the plaintiff in a directed verdict for the defendant, Pieseski v. Baltimore & Ohio Railroad Company, 393 F.2d 900 (3d Cir. 1968),[14] the record before us sustains the direction of a verdict for McKay. Likewise, the jury was warranted in concluding that Mesta had no duty to warn against the use of its pickling machine in the circumstances demonstrated by the record. The primary issue is whether Mesta sold the pickler in a defective condition unreasonably dangerous to the user. Although the record is replete with expert opinion as to how the Mesta pickler could have been made safer, again no testimony was offered by anyone who had actually seen the chain link engage the flange of the loading rack on the instant occasion. The word unreasonably should be emphasized in speaking of an unreasonably dangerous item. A defect, in design or manufacture, is the seed out of which liability grows, when combined with the element of unreasonable danger. We find neither ingredient in appellant's proof.
 
 
 12
 Mesta relinquished control of the pickler upon delivery. The machine was assembled by Jones & Laughlin. Mesta had no contractual obligation to service the machine or replace parts. Its drawing contained specifications for bronze chains to be used in the pickling process which were disregarded by J & L in its purchase order to McKay. In short, the evidence as a whole strongly militates against appellant's liability claim against Mesta.
 
 
 13
 Finally, we find no error in the trial court's refusal to charge the jury regarding the Pennsylvania Health and Safety Act, Act of 1937, P.L. 654. Appellant sought to put this statute to the jury for the purpose of establishing negligence per se. The record is barren of any reference to the Act other than in the plaintiff's points for charge. A court is not required to comb general safety legislation in order to flesh out a bare allegation of negligence per se.[15] The Act sought to be included in the charge had no demonstrable relevancy to the appellant's case. The court was not required to take judicial notice of the proffered legislation in these circumstances.
 
 
 14
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 "This continuous pickler consists, inter alia, of four racks which are loaded with sheets of steel and immersed in vats of acid. Each of these racks are affixed to four chains suspended from arms approximately twenty-five feet above the tanks of acid. The purpose of dipping the steel into the acid is to remove mill scale and otherwise clean the sheets of steel." Appellee Mesta's brief, p. 2
 
 
 [2]
 Section 402A of the Restatement of Torts, Second was adopted as the law of Pennsylvania in Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966), and reads in pertinent part as follows:
 "(1) One who sells any product in a defective condition unreasonably dangerous to the user * * * is subject to liability for physical harm thereby caused to the ultimate user * * *.
 "(2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product. * * *"
 
 
 [3]
 The case was submitted to the jury with the following special interrogatories:
 
 
 [1]
 Did defendant, Mesta Machine Company, sell a machine which at the time of sale, and without a substantial change of conditions, was in a defective condition, unreasonably dangerous to the user when subjected to normal use, and which defect was a substantial contributing cause of the injury suffered by the user?
 
 
 [2]
 Was Mesta Machine guilty of negligence in the design of the machine, which negligence was a substantial contributing cause of the injury received by the Plaintiff?
 The jury returned answers of "no" to each of the foregoing questions.
 
 
 [4]
 Since the delivery of the pickler in 1937, Mesta had nothing further to do with the machine, insofar as inspection or replacement of parts was concerned. Appendix, 433a, 434a
 
 
 [5]
 Monel metal is a new development which apparently has far greater acid resistance than bronze. Appendix, 39a. The original continuous pickler contained bronze chains which Mesta had purchased in 1936 from an outside supplier (other than McKay) Appendix 92a
 
 
 [6]
 Appendix, 502a. The drawing was the same as originally supplied by Mesta in 1936
 6A Appendix, 504a.
 6B Order No. 111126.
 6C Appendix 505a, 560a.
 
 
 [7]
 "same as furnished on order P.O. 111126 dated in May, 1964." Appendix, 507a, 508a. Joseph C. Carey, sales manager of McKay, was called by Mesta as its witness. He stated that McKay filled the purchase orders of J & L as submitted. Appendix, 522a, 523a
 
 
 [8]
 "The loading rack was designed with four steel flanges on lugs, one at each corner of the base, each of which was to be engaged by a large link, called a "bull" link, as the bottom link on a chain; the rack would be lifted by the "bull" links of the chains being placed on the flanges of the lugs and immersed in an acid bath; with the chains oscillating rapidly up and down to create a more effective contact between the steel plates on the loading rack and the acid bath." Appellant's brief p. 2
 
 
 [9]
 This admission was important in light of the fact that the dimension of the chains and the flanges on the loading rack were likely to alter due to wear and tear of continued usage in the pickling process
 
 
 [10]
 Appendix 317a, 318a
 10A The record indicates that, whereas the specifications supplied by Mesta in 1936 called for a density of 1 inch in diameter of the chain links, none of the links on the chain measured by Ramey satisfied the specifications. He admitted on cross examination that if the links had been one inch in diameter as specified on the Mesta drawing, the flange would not have passed into any of them, and that it was only because the chain link was worn down from one inch to 41/64 of an inch that the flange could pass in. (Appendix, 316a, 317a). This loss of material due to chemical corrosion constituted a 30% reduction in the diameter of the chain. Evidence is contained in the record that such a reduction, although well beyond the replacement standard set forth in Pennsylvania's Regulations for Cranes, Booms and Hoists which were received in evidence, was not of sufficient degree to allow a chain link to engage one of the 3 x 6 inch flanges. A mechanical engineer employed by Mesta, and called as Mesta's witness, testified that by applying simple mathematics, he estimated that the diameter of the chain would have had to erode from the original one inch down to 35/64 of an inch in diameter, or 71%, before the opening would increase to three inches, thereby allowing it to engage the 3 x 6 inch flange.
 
 
 [11]
 See Restatement of Torts, Second Sec. 388 (1965); Rowe v. John C. Motter Printing Press Co., 305 F.Supp. 1001, 1006 (D.R.I.1969). In Berkebile v. Brantly Helicopter Corp., 219 Pa.Super. 479, 281 A.2d 707 (1971), the court held that in order for a product to be defective "it is not necessary that errors be made in manufacture; a properly made product is defective if its design is unreasonably dangerous." In Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969), we held that, under Pennsylvania law, a 'defective condition' was established within the meaning of Section 402A "by proving that the product functioned improperly in the absence of abnormal use and reasonable secondary causes." In footnote 3 of that opinion, reference was made to Franks v. National Dairy Products Corp., 282 F.Supp. 528 (W.D. Tex.1968), where the court stated: "* * * It is essential to the proving of a defect [when circumstantial evidence is the only proof] * * * that the plaintiff negative improper handling or use and that plaintiff negative causes of the accident other than the product's own defective condition."
 
 
 [12]
 See Woods v. Pleasant Hills Motor Co., 219 Pa.Super. 381, 281 A.2d 649 (1971)
 
 
 [13]
 See Restatement of Torts, Second, Sec. 402A, comment g
 
 
 [14]
 See the discussion concerning the standard of review for motions for directed verdict in Alman Bros. Farm & Feed Mill, Inc. v. Diamond Lab, Inc., 437 F.2d 1295, at 1298 (5th Cir. 1971)
 
 
 [15]
 Cf. Berkebile v. Brantly Helicopter Corp., supra; Gatenby v. Altoona Aviation Corp., 407 F.2d 443 (3d Cir. 1968)