R. Richard BURCHILL, Appellant,

v.

KEARNEY–NATIONAL CORPORA-
TION, INC., a corporation, et al.

v.

PENNSYLVANIA ELECTRIC COM-
PANY, a corporation, Third-
Party Defendant.

No. 71–1630.

United States Court of Appeals,
Third Circuit.

Argued May 2, 1972.

Decided Oct. 10, 1972.

Joseph B. Bagley, Bagley, Sydor & Heck, Pittsburgh, Pa. (Ronald H. Heck, Bagley, Sydor, Heck & Elder, Pittsburgh, Pa., on the brief), for appellant.

George M. Weis, Weis & Weis, Pittsburgh, Pa., for appellee.

Before VAN DUSEN, GIBBONS and JAMES ROSEN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

In this diversity personal injury case appellant, the plaintiff in the district court, appeals from an order granting a motion for a directed verdict renewed at the end of the entire trial on the issue of liability. Fed.R.Civ.P. 50. The plaintiff was proceeding on a theory of strict liability under the Restatement (Second) Torts § 402A (1965) adopted by Pennsylvania as its common law. Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966). The injuries occurred when appellant, a journeyman lineman employed by the Pennsylvania Electric Company, was, while working on top of a pole, thrown to the ground when the pole broke. He sued Kearney-National Corporation, Inc., the manufacturer of an allegedly defective fitting, and it joined Pennsylvania Electric Company as a third party defendant.

Appellant's theory of the case was that the pole broke because the fitting which was manufactured by Kearney and by which a guy wire was attached to the pole, gave way under a stress which was within anticipated normal range. The fitting in question is a T shaped cast iron device. In each cross bar of the T there is a hole through which bolts pass to fasten the fitting to a wooden pole. In the upright of the T there is a larger hole through which a bolt passes to connect a cable. The claimed defect is a crack in one arm of the T.

The pole was at a point where electric transmission lines made an acute angle turn. Because of the acute angle turn the electric transmission lines placed a strain on the pole in the direction of the internal dimension of the angle. To counteract that strain four guy wires were run from the upper part of the pole to the ground in directions opposite to the direction of strain of the electric transmission lines. The guy wires were fastened to the pole by means of T fittings manufactured by Kearney. At the time of the accident three of the guy wires had become disconnected and the pole was leaning slightly. The crew of which appellant was a part was engaged in replacing these three guy wires. There was evidence that the appellant felt the pole move slightly before it broke, and that eye witnesses heard a snap and observed a sagging of the lines before the pole actually broke. This evidence, if believed, would have warranted a finding that the T fitting broke before the pole broke, since it is undisputed that after the accident the T fitting was in fact broken into two pieces through one arm of the T. One piece, an arm of the T fitting, was found still bolted to a segment of the broken pole. (Exhibit P. 7). The second piece consisting of the other arm and the T upright, was found still fastened to the cable and bolted to another segment of the pole. (Exhibit P. 10). The break between the two pole segments in question occurred roughly at the point where the bolt fastening the second piece of the T fitting passed through the pole.[1] The T fitting in normal position rested with the two arms flush with the pole and in vertical alignment with it. After the accident the piece of fitting consisting of an arm only was still in place flush with the pole. (Exhibit P. 7). The piece consisting of the other arm and the T upright was no longer flush with the pole but had been bent outward from flush alignment with the pole in the direction from which the strain of the cable would have been applied.

There is evidence that the T fitting was five to ten years old at the time of the accident, and that such fittings were expected to last for the life of the line, about 40 years. (140–41a).

The witness Brunot described the condition of the T fitting immediately after the accident.

"Q. What kind of condition was it in?

A. It was in two pieces—two separate pieces as I recall. As it comes to mind very strongly, at one end of it there was rust. There was a clean part where it broke and the rest of it was, there was rust like it had been cracked. That's on the one side that broke.

Mr. Weis (attorney for defendant Kearney): I move to strike that opinion for lack of qualification of Mr. Brunot.

The Court: I think so. We're not to that point yet. There were two pieces and he described what he saw.

Q. Did you say it was rusty?

A. Yes, there were two pieces and this stands very vividly in my mind because we were concerned about it. It did show an indication of rust and the rest of it

---

1. The pole also broke at a second place.

was a clean break, in my opinion." (97a).

The witness, who was a member of the same lineman crew as the appellant, was then shown Exhibit P. 1, a photograph of the two segments of the broken T fitting, and was asked to point out to the jury the rust that he saw. The attorney for the defendant objected that Brunot had not been listed as an expert witness and could not testify that he observed rust. The court so ruled. An examination of Exhibits P. 1, P. 7 and P. 10 discloses that through the cross section of the arm of the T fitting at the point where it broke there is discoloration, which appears to be oxidation, on both parts, except for approximately a quarter inch of the cross section which originally rested nearest to the pole. That quarter inch of cross section appears to be fresh unoxidized metal. It would appear, therefore, that oxidation had taken place in a crack in the T fitting for some time prior to the break.

■ The ruling excluding Brunot's testimony about the partially rusty cross section at the point of a break is inconsistent with the discussion concerning expert testimony which took place at the pretrial conference. (47a). Moreover it is quite plainly wrong that one must be an expert to identify the rusted and the unrusted parts of a cast iron fitting. The expression of such an "opinion" is nothing more than the expression of the perception of the witness of a phenomenon within the common experience of most persons—even judges. *See* Proposed Rules of Evidence for the United States District Courts and Magistrates 7–01 (1971); *cf.* Smith v. Penn Federal Corp., 315 Pa. 20, 172 A. 147 (1934). The ruling was repeated with respect to other witnesses. (e. g. 131a, 153a).

The appellant had indicated that he would use as experts four members of the Pennsylvania Electric Company safety investigating committee who had been assigned to investigate the accident and that they would testify that in their opinion the failure of the T fitting caused the accident. (47a.) The committee reported to Pennsylvania Electric Company that the sequence of events which led to the collapse of the pole started with the failure of the T attachment, and all four affirmed this conclusion in their testimony at the trial.

There is evidence that the fitting in question should withstand a 12,000 pounds pressure and that a $\frac{3}{4}$ ton hoist which was exerting pressure on the cable would exert 1500 pounds pressure. (129a, 145a). Jenkins, a member of the safety investigating committee referred to above testified:

"Q. Is there any way a man could apply enough pressure to the [$\frac{3}{4}$ ton] coffin-hoist to break this attachment?

A. Well, if it's a good attachment, I don't think a man could put enough pressure on a coffin-hoist, to break one." (130a).

The witness Jones, an engineer for Pennsylvania Electric Company, testified that he was charged with determining why the T fitting broke and why the pole in turn broke. He sent the T fitting to a manufacturer of such fittings to perform a metallurgy test. "The reply I got was that it was good metal." (144a). The company which tested the part, however, lost it, and it was not available at the time of trial. (145a). The metallurgical report is not in evidence. Jones' testimony does not refer to testing for any possible defect other than testing whether good metal had been used in the casting; for example, whether any stresses had been introduced in the casting process which might have resulted in a crack.

At the end of the entire case the district court in the presence of the jury ruled:

"As the trial judge I have to conclude that the plaintiff has not made out his case by a fair preponderance of the evidence. That is, that there was a defect at the time it was sold to Pennsylvania Electric Company." (209–10a).

■ If, as appears on its face, this ruling represented a weighing of the preponderance of the evidence by the trial court, it was a usurpation of the function of the jury. It was for the trier of the facts to determine the preponderance of the evidence so long as any evidence supported the plaintiff's theory of the case. In a memorandum on the appellant's motion for a new trial, however, the district judge concludes:

"There is thus presented a record in which there is simply no evidence of a defect at the time the cast iron part was furnished to Pennsylvania Electric Company, nor is there any evidence that it was dangerous to the ultimate user at the time it was furnished or sold." (247a).

In arriving at this conclusion the court selects certain parts of the testimony which tend to cast doubt on the appellant's contention that the T fitting broke first. No reference is made, however, to the evidence referred to above tending to establish that fact, to the plain evidence in the photographic exhibits of internal oxidation in the cross section where the T fitting broke, or to the excluded evidence of observations of the condition of the T fitting made immediately after the accident.

■ The Pennsylvania rule on strict liability is set forth definitively in Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969) and in MacDougall v. Ford Motor Co., 214 Pa.Super. 384, 257 A.2d 676 (Pa.Super.1969). Judge Staley wrote in *Greco*:

"The test we must apply is whether reasonable and well balanced minds would be satisfied from the evidence adduced that the defective condition existed when the machine was delivered." 407 F.2d at 90.

*MacDougall* makes clear that in a strict liability case under Pennsylvania law a plaintiff does not have to produce evidence of the specific defect which caused the accident. The occurrence of a mal-

function in the absence of abnormal use and reasonable secondary causes is evidence of a defective condition within the meaning of § 402A.

■ In an attempt to avoid these authorities the district court points to the testimony of Jones that he sent the cast iron fitting to a laboratory and the laboratory reported that the metal they examined was good. (248a). As we pointed out above, the metal may have been "good" but may still have contained a crack due to stress during manufacture or some other cause. But even if Jones' hearsay report on what the metallurgical test showed were to be accepted as evidence of absence of a defect that evidence could at best be weighed against the evidence tending to show the initial failure of the T fitting, the photographic evidence which shows that there was internal oxidation in the cross section of the T fitting at the point of failure prior to the accident, and the improperly excluded evidence of observations of such internal oxidation immediately after the accident. In this case the trial judge usurped the functions of the jury by weighing the preponderance of the evidence and finding the facts in favor of the defendant Kearney-National Corporation, Inc.

The judgment will be reversed and the case remanded for a new trial.

VAN DUSEN, Circuit Judge (dissenting).

I respectfully dissent from the conclusion of the majority opinion reversing the district court judgment. The Pennsylvania cases, as well as those of this court, and the record, in my view, support the decision of the district court stated as follows (page 247a):

"There is thus presented a record in which there is simply no evidence of a defect at the time the cast iron part was furnished to Pennsylvania Electric Company, nor is there any evidence that it was dangerous to the ul-

timate user at the time it was furnished or sold." [1]

Comment G of Section 402A of the Restatement of Torts provides:

> "The rule stated in this section applies only where the product is, *at the time it leaves the seller's hands*, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. . . . The burden of proof that the product was in a defective condition *at the time that it left the hands of the particular seller* is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was *then* defective, the burden is not sustained." (Emphasis added).[2]

In Woods v. Pleasant Hills Motor Co., 219 Pa.Super. 381, 281 A.2d 649, 651 (1971), the Pennsylvania Superior Court adopted this Restatement position, using this language:

> "The burden of proof that the product was in a defective condition at the time it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which supports the conclusion that it was then defective, the burden is not sustained. Comment G to § 402A, Restatement 2d, Torts."

In Greco v. Bucciconi Engineering Co., 407 F.2d 87, 90 (3d Cir. 1969), this court stated:

> "Bucciconi vigorously contends that appellee failed to sustain his burden of showing the existence of a defect at the time of sale. The test we must apply is whether reasonable and well balanced minds would be satisfied from the evidence adduced that the defective condition existed *when the machine was delivered.*" (Emphasis added, footnotes omitted.)

In Kaczmarek v. Mesta Machine Company, 463 F.2d 675 (3d Cir., Opinion filed June 30, 1972), this court said:

> "Assuming that the appellant's reconstruction of the accident is correct, liability does not automatically follow unless *the appellant satisfied his burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller.*" (Emphasis added.)

There was no proof of when the attachment was actually sold by defendant. Mr. Jones testified that he would think that the particular attachment was purchased very close to the pole's installation date of 1958 (which would have been approximately eight years before the accident), but acknowledged that it may have been a reused part that was 15–20 years old at the time it was installed on the pole (see 146–47a). Jones could not even establish that the attachment had been purchased from the defendant and acknowledged that his conclusion was "just guesswork" (see pp. 150–51a).

The plaintiff attempted to introduce testimony at the trial to the effect that there was a rusted portion of the attachment that was obvious to those examining the attachment after the accident. If this evidence had been properly developed at the trial, it might have supported a finding of a defective condition in the attachment at the time that it was put on the pole eight years earlier. But in order to do this, I think that plaintiff was required to present an expert to testify that an analysis of the part indicat-

---

1. The ruling made at trial was as follows (243a):
"As the Trial Judge I have to conclude that the plaintiff has not made out his case by a fair preponderance of the evidence. That is, that there was a defect at the time it was sold to Pennsylvania Electric Company."

2. L. R. Frumer, 2 Products Liability, § 16A [4] at 3–221–22:

> "The task of the claimant's counsel is to show that the damaging event resulted in the course of a normal use of the product, and not from an unforeseeable misuse, and *further, to show that the defect causing the damaging event existed when the defendant relinquished control or possession of the product.*" (Emphasis added, footnotes omitted.)

ed a defect in the casting process which might have resulted in a crack, or at the least to present expert testimony as to how long the rust indicated that the crack had been in the attachment. As it is, the most that can be said is that after the accident occurred, at least eight years after the attachment had been purchased from the defendant, there was a rusty crack in the section of the attachment that broke. An examination of the pictures (P–1, P–7 and P–10) provided in the supplemental record does not disclose to me where the rust was. I do not believe that the products liability law of Pennsylvania permits a finding on this record that the attachment was sold in a defective condition.

I note that it appears that plaintiff's decision to introduce the testimony regarding the rust in the cracked attachment was an after-thought. No mention of this defect at all was made at pretrial. Indeed, when defendant's counsel objected to this testimony regarding rust at the trial, plaintiff's counsel candidly stated:

"I can readily admit that it was not in the pre-trial record." (153a).

It seems to me that in these circumstances, sound principles of judicial administration would preclude plaintiff from "surprising" defendant with this new theory of the attachment's "defective condition." It would seem that unless the trial is to become a matter of unfair surprise, the district court must hold plaintiff's counsel to the theories and grounds of liability developed in the pre-trial proceedings. See Valdesa Compania Naviera v. Frota Nacional de Petroleiros, 348 F.2d 33, 37–38 (3d Cir. 1965), and cases there cited.

Finally, I do not believe that the evidence justifies a finding that the T-fitting broke before the pole broke (74a, 83a, 84a, 88a, 94a, 101a, 111a). Mr. Smith, the chairman of the Pennsylvania Electric Company safety investigation committee, referred to in the majority opinion, who actually wrote the report, acknowledged that the committee started off by assuming that the broken attach-

ment "must have caused" the accident and spent the rest of the analysis "trying to show how that caused the pole to collapse" (157–158a). Indeed, Smith acknowledged that the committee never even considered the possibility that the pole may have broken first (158a). Further testimony by the other members of the committee revealed that the committee had only one meeting four days after the accident (168a), that they had not seen the results of the testing of the attachment (166a, 169a), and that they may not have even seen the photographs taken after the accident (169a). Finally, when asked by the court whether, as often happens, the committee had trouble reaching agreement, Smith candidly answered:

"Not really. We pretty well agreed what we were going to put in the report before I ever started it." (160a).

For the foregoing reasons, I would affirm the judgment of the district court.