## Cuddy Foods, Ltd., v. Swab Wagon Co., Inc.

*Richard H. Wix*, for plaintiff.
*Craig A. Stone*, for defendant.

CALDWELL, *J.*, January 9, 1975—Following the entry of a compulsory nonsuit, plaintiff filed a mo-

tion for a new trial and a petition to take off the nonsuit. These matters are before us for disposition.

Plaintiff is engaged in the business of hatching turkey eggs and shipping pullets to turkey growers and other consumers. Defendant is in the business of constructing various types of truck bodies. In September or October of 1968, plaintiff ordered a poultry transport van from defendant. The van was constructed by defendant, mounted on a truck chassis and delivered to plaintiff in October 1968. On April 27, 1971, the van was en route from Canada and was loaded with boxes of turkey pullets. The truck and van were routinely checked at the Canadian border and nothing unusual was found. About two hours later, flames were discovered coming from within the van as the vehicle was being operated in the vicinity of Toledo, Ohio. Upon stopping, the driver opened the back doors of the van and the fire within "exploded" and consumed the turkey pullets. Parts of the interior of the van were also fire damaged.

Suit was commenced against defendant on the theory of strict liability under Restatement 2d, Torts, §402A. It is alleged by plaintiff that the electrical wiring in the van was defectively installed and that the fire resulted from this cause.

Section 402A of the Restatement is firmly imbedded in Pennsylvania law, and one who pursues a claim of this nature has the burden of proving, among other things, the following facts:

(1) That the product was in a defective condition *at the time it was sold.*

(2) That the defect rendered the product *unreasonably dangerous.*

(3) That harm or loss was caused *"thereby"* to the ultimate user or consumer.

See Webb v. Zern, 422 Pa. 424, 220 A. 2d 853 (1966); MacDougall v. Ford Motor Co., 214 Pa. Superior Ct. 384, 257 A. 2d 676 (1969); Forry v. Gulf Oil Corp., 428 Pa. 334, 237 A. 2d 593 (1968).

The evidence disclosed the specially-equipped van had seven exhaust fans in the roof and that heaters were installed under the floor to regulate the temperature in cold weather. It was shown that the interior of the van must be well ventilated to keep the cargo alive and the fans were run constantly to pull air through the van. Ventilation ports were located in the front doors of the van, behind the truck cab, as well as in the rear doors. The van had 14 roof vents and air intakes were mounted along the lower edges of both sides of the van to provide a source of fresh air. The fans and heaters were controlled by switches and gauges in the truck cab.

At the time of the fire, the van had been in service for two and one-half years. The van and the original chassis had traveled about 300,000 miles. A month or so prior to the fire, plaintiff had the van removed from its original chassis and installed on a 1971 truck body. Defendant had nothing to do with this work. The remounting of the van necessarily involved removing and replacing the electrical connections between the van and the old and new cabs. The new chassis and van traveled about 30,000 miles prior to the date of the loss.

Two days after the fire, plaintiff engaged the services of an electrical engineer who inspected the damaged van for about one hour. The extent of damage to the van was not detailed but, it was determined that the fire burned the insulation from the interior wiring. The witness also noticed that the ends of some staples, used to hold an insulated wire to a wooden frame, had penetrated another surface of the frame and were either close to or in

contact with a grounded metal bar. After completing his visual inspection, the expert directed that some of the wiring be removed from the van and forwarded to him for testing. Upon further examination of the wire submitted to him, marks were found in two places on a bare metal conductor. In his opinion, these marks were made by two staples. However, the witness was unable to establish any connection between the staples he observed in the truck and the wire he examined later:

"Q. And was it also my understanding that you were not able to determine whether these two defects [the marks on the conductor] were at the areas where the staples touched the bars?

"A. No, I don't know that because I didn't remove the wiring [from the van]."

The witness opined that *if* the staples touching the metal bar had been installed too tightly, and had broken through the insulation and come in contact with the conductor, an arcing could occur. This is because the staple would then be in contact with both a live electrical conductor and the grounded metal rod. It could not be determined whether any staples had, in fact, penetrated the insulation on the wire because, as noted, the insulation was consumed by the fire. Furthermore, because of the fire, the expert was unable to determine whether the staples used in the assembly of the van were insulated or not and no effort was made to produce evidence on this point. It was acknowledged that the two marks on the conductor could have been caused by pulling the wire against the staples during the process of removing the wire from the wooden frame following the fire. The manner in which the wires were removed from the van was not shown and it cannot be overlooked that these

isolated marks on the wire could have resulted from many other unknown causes.

Did plaintiff prove the "defects" alluded to by its expert witness existed when the van was delivered by defendant? We think that any such suggestion would be no more than a guess. The suppositions undertaken by plaintiff's witness to connect the two marks on a wire to the assembly of the van are not enough to remove this contention from the realm of speculation. Furthermore, the witness agreed there was no evidence that any arcing had occurred at the suspected points on the wire or that the fire originated from electrical arcing. The expert's uncertainty as to the van being defective when delivered, or as to the cause of the fire, can best be summed up by reference to the following testimony:

"Q. There was no evidence of arcing at those areas?

"A. No.

"Q. You have no way of telling whether these conditions existed two and half years prior to the date of your inspection, do you, sir?

"A. No. That is on that particular van that you are referring to.

"Q. That is the van we are talking about here today, the one that burned, is that correct?

"A. That is correct, sir.

"Q. So you found no evidence of arcing?

"A. No.

"Q. When you say this fire was caused by the electrical system, you can't even pinpoint where in the electrical system there could have been a defect or cause of this fire, can you, sir?

"A. No. I am quite certain that all the wiring wasn't returned to me.

"Q. All right, so it even might have been in some wire that wasn't returned to you?

"A. Yes.

"Q. And you are unable to express an opinion as to what the defect was that caused this fire, isn't that true?

"A. Well, my opinion is it had to be due to arcing.

"Q. But you found no evidence of arcing?

"A. No, not in what was submitted to me."

The witness inspected two similar vans built by defendant and described several conditions which in his opinion constituted potential "defects" in the electrical wiring of those vans. None of these conditions was shown to have existed in the damaged van, but even if they had, the witness admitted he could not testify that any of them would have been responsible for the fire. Nevertheless, he expressed an opinion that the fire must have been caused by one of several suggested sources all having to do with the electrical system in the van. In our judgment, plaintiff's evidence did not establish a defective electrical installation, but in any event there was no proof whatever as to how the fire started and we found this to be a matter of pure conjecture by the witness. The witness was a qualified electrical engineer but offered no particular expertise in the area of determining the origin of fires.

Numerous cases under §402A have held that where a malfunction in machinery or equipment, etc., occurs the fact of the malfunction is some evidence of the existence of a defective condition. However, where plaintiff is unable to show a malfunction, other evidence must be presented to establish the fact that a defective condition existed when the product was sold. See Woods v. Pleasant Hills Motor Co., 219 Pa. Superior Ct. 381, 281 A. 2d 649 (1971). In the case before us there was no evidence that anything malfunctioned, and all that was shown was the fact that a fire was discovered

in the van. A malfunction of the electrical system cannot be inferred from the mere fact of the fire, particularly in a van which had numerous openings to the outside. In our opinion such a conclusion would ignore the myriad possible causes of the fire.

The difficulty inherent in showing the existence of a defect where a product has been in use for some time was examined by the Bucks County Court in Stein v. General Motors Corp., 58 D. & C. 2d 193 (1972). There an automobile, purchased 26 months earlier, veered out of control. Judge Bodley ably reviewed the development and application of strict liability under §402A and the leading Pennsylvania cases decided under the doctrine. He distinguished the situations where relatively new equipment malfunctions and one where an inexplicable event occurs in an item that has been in use for a considerable time. Reference to his opinion provides an excellent discussion on the subject of strict liability as it applies to this case. In such cases we believe he correctly said:

"It would seem to this writer that a plaintiff must do more than prove that he was injured by or in the defendant's product. *He must prove that a defect existed before the product left possession of the manufacturer and that the defect itself was the actual proximate cause of the injury.* Strict liability should not be translated into absolute liability." (Emphasis added.)

Judge Bodley's opinion was affirmed per curiam in 222 Pa. Superior Ct. 751, 295 A. 2d 111 (1972).

The burden is on plaintiff to prove that the product in question was defective when it left the hands of defendant and that it was unreasonably dangerous to the buyer *at that time*. Basically plaintiff attempted to meet this burden by showing the happening of the fire, coupled with testimony concern-

ing general conditions which the expert witness considered shortcomings in the van's electrical system. Because these conditions were not shown to have existed when the van was sold *and* were not tied adequately to the origins of the fire, we believe it would be pure guesswork to permit the jury to determine that *a defective condition unreasonably dangerous to the consumer* existed in the electrical system of the van when it was sold in October 1968, some two and one-half years and 330,000 miles prior to the loss. As has been pointed out in many cases, §402A does not turn a seller into an insurer and does not allow recovery by showing a loss. In Schreffler v. Birdsboro Corp., 490 F. 2d 1148 (3rd Cir., 1974), which involved a claim under §402A, the court said a directed verdict is correctly entered if the record is critically deficient of the minimum quantum of evidence from which a jury might reasonably afford relief.

Equally, if not more compelling is the matter of causation. Under §402A plaintiff must prove there was a causal connection between the defect and the accident, and this may be established by direct or circumstantial evidence. In the instant matter there was no competent evidence of causation. Although plaintiff's expert witness stated his opinion that the fire originated from an electrical arcing, there was no evidence that an arcing had occurred or that the possibility of arcing actually existed in the van prior to the fire. The witness candidly admitted that his opinion was not based on affirmative evidence as to where and how the fire started, but was the result of eliminating or disregarding other possible causes for the fire. He acknowledged that careless smoking could have started the fire but he excluded this from his consideration:

"Q. Really, your opinion is based on an elimina-

tion of a number of causes [of the fire], isn't that correct?

"A. That is correct, yes.

"Q. So you wouldn't find, had you not excluded the other possibilities, . . . electricity was the cause of the fire, . . . ?

"A. I did it by exclusion, yes."

There is no doubt that where plaintiff points to an alleged defective condition in a product he must also prove the defective condition was the proximate cause of the loss. See Southwire Co. v. Beloit Eastern Corp., 370 F. Supp. 842 (E.D. Pa., 1974). To permit a jury to determine from the scant evidence in this record that there was a defective electrical system in the van when it was sold, and that this is what caused the fire, would be stretching the valid principles of §402A to the breaking point.

Another point that cannot be overlooked in discussing proximate cause is the fact that about a month or so before the fire the van was removed from the original chassis and mounted on a new one. The electrical system in the van was connected to gauges and switches in the truck cab, with which the operator controlled the temperature and ventilation in the van. The wiring from the van had to be disconnected from the old cab and replaced in the new one. As we have noted, defendant had nothing to do with this work and the manner in which it was accomplished was not explained. Plaintiff's expert, in his testimony, assumed that the wiring inside the van would not have been changed in any way but a subsequent witness indicated otherwise. One of defendant's employes, called as a witness by plaintiff, testified that a junction box mounted inside the van was not present when the van was originally delivered to plaintiff:

"A. . . . He [the expert] also referred to a junction box, . . .

"Q. What is a junction box?

"A. That I don't know. *We do not use junction boxes.*

"Q. What is a junction box?

"A. A metal box where wires are connected. It is put—normally it would be used on 115 to 230 volt wiring to protect the joined wires. But we do not use junction boxes.

"Q. Is there anything that a junction box might be used for in connection with changing the chassis?

"A. Well, according to the testimony the body was transferred onto the new chassis, and it is entirely possible that the original wiring was cut on the inside of the body before removal from the old chassis and reconnected when remounted on the new truck chassis and the connection made in a junction box, which is not standard procedure.

"Q. That is not your procedure?

"A. *That is not our procedure.*" (Emphasis added.)

The expert witness did not indicate whether his opinions would have been affected by the knowledge that some alterations were apparently made to the electrical wiring *inside* the van prior to the fire.

In summary, we conclude plaintiff's evidence did not establish the existence of a defect in the installation of the electrical wiring, etc., in the van at the time it left defendant's hands or that the loss was related to an electrical fire or failure. The length of time the van was in use and its installation on a new chassis lends support to our conclusion that plaintiff's claim is based on supposition and not evidence. We hold that, under the evidence offered by plaintiff, a jury would be speculating in concluding that there was a defect unreasonably dangerous in the van in October 1968 or that the fire resulted from a long-standing defect in the electrical sys-

tem. In our opinion the application of §402A in the present case would be error and we enter the following

## ORDER

And now, January 9, 1975, plaintiff's motion for new trial and petition to remove a nonsuit are denied.