John J. WOJCIECHOWSKI

v.

**LONG–AIRDOX DIVISION OF MARMON GROUP, INC. a corporation and Marmon Group, Inc. a corporation, Appellants,**

v.

**PITTSBURGH COAL COMPANY DIVISION OF CONSOLIDATION COAL COMPANY.**

No. 72–1839.

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1973.

Decided Nov. 29, 1973.

Bernard J. McAuley, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., for appellants.

Anthony J. Polito, Rose, Schmidt & Dixon, Pittsburgh, Pa., for Pittsburgh Coal Co.

Saul Davis, Pittsburgh, Pa., for John J. Wojciechowski.

Before BIGGS, ADAMS and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This is an appeal by the defendant manufacturer from an adverse jury verdict in a suit for personal injuries grounded solely upon the strict liability theory of Section 402(a) of the Restatement (Second) of Torts. Since we find appellant's contentions of trial error without merit, we affirm.

Plaintiff Wojciechowski was employed by the third party defendant, Pittsburgh Coal Company Division of Consolidated Coal Company (Employer). The Employer leased from defendant, Long-Airdox Division of Marmon Group, Inc., (Long-Airdox), a number of identical compressed air blasting devices manufactured by Long-Airdox. The Long-Airdox system, a replacement for the older method of blasting with powder to release coal for mining, utilizes a sudden release of compressed air to fracture a coal seam. Air is compressed in a generator located on the company premises. The generator is connected by piping to a number of "blowdown valves," each of which is in turn connected by about 125

feet of tubing to a single shell. The blowdown valve, regulating the air flow to and from the shell to which it is connected, actually consists of two separate control valves. The air supply valve, regulated by a lever, controls the flow of compressed air from the generator into the shell. The bleeder or air release valve, regulated by a removable hexagonal wrench, controls the return flow of air from the shell back to the valve and then into the atmosphere. The shell itself is about fourteen feet long and weighs about eighty pounds.

During normal operation a trained, licensed employee, called a shot firer, opens the air release valve and closes the air supply valve, thereby releasing most compressed air from the shell. He then walks over to the coal face and inserts the shell into a hole previously made in the face. Assuring himself that no one is in the vicinity of the shell, he then returns to the blowdown valve. He uses the wrench (hex key) to shut the bleeder valve and he manually opens the air supply valve, the result being a build-up of compressed air in the shell. After approximately a half minute, the pressure in the shell reaches a predetermined level of approximately 8000 pounds per square inch. At that moment the air in the shell is released from the head with an explosive force sufficient to fracture the coal face in the vicinity. The shot firer, still at the blowdown valve, reverses the air flow by closing the air supply valve and opening the bleeder valve. The air remaining in the shell after the explosion makes a loud hissing noise as it returns from the shell through the pipe to the blowdown valve. The shot firer can then return to the coal face, place the shell into another previously made hole, and repeat the operation. It should be noted that the Airdox system has an automatic repeat feature; if the supply valve is kept open and the bleeder valve kept shut, the shell will fire continuously every half minute as the pressure in the shell rebuilds up to the predetermined level.

The Employer's safety regulations and Long-Airdox's written and oral instructions to the Employer required that the entire operation be performed by a single person and that the shot firer take the hex key with him when he returned to the coal face to move the shell. The rule was intended to protect the person at the coal face. The shell at the coal face can not be seen from the site of the valve. If someone else remained with the hex key at the valve, the latter might through a mix-up in signals prematurely reset the valves and cause the shell to fire before the person at the face was in the clear.

On the evening of Friday, September 1, 1967, plaintiff had fired two shots by himself without incident when his foreman, Davis, requested that plaintiff hurry the blasting operation. Davis suggested that they work together in performing further firings. Plaintiff would stay at the coal face between shots, while Davis would remain at the valve and set off successive blasts. Plaintiff, who had been a shot firer since 1949, complied with Davis' request even though he knew the procedure would violate company safety rules. The first two shots went off without incident, plaintiff placing the shell into holes in the coal face and stepping into the clear, and Davis then setting off a blast. Just before Davis set off the second blast, Baughman, on his way to the coal face where his job was to drill the holes for the shell, came up to Davis at the valve. Baughman waited there until Davis fired the shot. Baughman testified that he saw Davis then shut the supply valve and open the bleeder valve; he then heard the sound of air returning from the shell. Davis told Baughman that he had to leave the valve, but Baughman left the valve for the coal face with no knowledge of whether Davis actually left the valve.

Meanwhile, after Davis' second blast plaintiff returned to the shell. As he was placing the shell in the next hole, the shell gave a full force blast into his face causing him serious injury. The

blast occurred in plain view of Baughman, who by that time was at the coal face. Although plaintiff had not heard any sound of air before the blast, immediately thereafter he heard the sound of air bleeding out of the shell. Several employees immediately went to aid plaintiff. However, there was no testimony concerning events at the blowdown valve between the time Baughman left the valve and four to five minutes after the succeeding blast. At that later time the bleeder valve was open as it should be following a blast; the wrench which controlled the valve and had been used by Davis was not there. The deposition of Davis, who died before trial, was read into evidence at the trial. Davis stated that after Baughman left the valve, he had walked away to speak to another employee, Spotty, who was dead at the time Davis gave his deposition.

The same shell and valve were used without incident for the remainder of the Friday evening shift. The following morning, Taylor, the company safety expert, fired the shell several times without incident, finding no evidence of a defect which might have caused the accident.[1] Taylor returned to the mine for the entire Sunday night and Monday night shifts to observe the firing of the suspect shell, and during those sixteen hours of continuous firings he saw no malfunction or anything else unusual.

Plaintiff, who was precluded by the Workmen's Compensation Act from bringing suit against his employer, Pittsburgh Coal,[2] sued Long-Airdox[3] in diversity on theories of strict products liability and also negligent design of the equipment allegedly causing the injury. Long-Airdox filed a third party action grounded in negligence for contribution by Pittsburgh Coal.[4] Plaintiff abandoned his negligence theory before any testimony was taken, leaving only his strict liability claim to be tried.

The strict liability claim was based on Section 402A of the Restatement (Second) of Torts (1965), which has been adopted by the Pennsylvania Supreme Court as the law of Pennsylvania.[5] Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966). That section states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

---

1. Taylor testified that he found a slight leakage in the supply valve, permitting some air to flow into the shell even when the valve was closed. However, Taylor said that when he also closed the bleeder valve, the shell did not fire during the six minutes he waited. He next opened the supply valve and also opened the bleeder valve halfway, sending some of the supply air into the shell and the rest directly out the bleeder valve. The shell did not fire during the three minutes that Taylor waited. When he then closed the bleeder valve, the shell fired as it should have. These experiments on the suspect shell provide almost conclusive evidence that the leak in the supply valve could not have caused the accident.

2. 77 P.S. § 481. Hartwell v. Allied Chemical Corp., 457 F.2d 1335, 1337 (3d Cir. 1972). Socha v. Metz, 385 Pa. 632, 123 A.2d 837, 839–840 (1956).

3. Such suits against third parties are permitted under Pennsylvania law. Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563, 580–582 (3d Cir. 1963).

4. Socha v. Metz, 385 Pa. 632, 123 A.2d 837, 840 (1956).

5. We must apply Pennsylvania choice of law rules in this diversity case. Since the accident in question and all significant contacts involve Pennsylvania, it is clear that Pennsylvania courts woud apply Pennsylvania law. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964).

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The Pennsylvania courts have also adopted Comment G to Section 402A, which provides that

The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

Woods v. Pleasant Hills Motor Co., 219 Pa.Super. 381, 281 A.2d 649, 651 (1971).

At the close of defendant's case, the Employer's motion for dismissal was granted. The dismissal was based on the court's finding that the evidence would not support a finding by the jury that the accident was caused concurrently by a defect in the equipment as well as improper human intervention at the blowdown valve. The trial judge's theory was that regardless of whether or not the Employer was negligent, the accident was caused either from the shell improperly exploding while the valves remained in the bleeding position, or else exploding, as it was designed to do, because someone at the valve fired the shell. Under neither of these alternatives would the Employer be liable for any damages,[6] and its dismissal would avoid the possibility of an inconsistent verdict holding the defendants jointly liable. The jury, after being properly instructed on the elements of Section 402A liability, found against Long-Airdox, the only remaining defendant. Damages of $120,000 were awarded at a separate hearing.

Long-Airdox contends that the trial court erred by (1) permitting testimony concerning prior and subsequent incidents involving Airdox shells; (2) dismissing the action against the Employer on the ground that the possibility of concurrent causation of the accident was too speculative; (3) failing to instruct the jury on assumption of risk by plaintiff; (4) refusing to permit Long-Airdox to call plaintiff's expert as a witness or to permit Long-Airdox to introduce interrogatories answered by plaintiff's expert, after plaintiff elected not to call the expert as his own witness; (5) prohibiting defendant's counsel from asking Taylor, the company safety expert, his opinion as to the cause of the accident; and (6) refusing to answer a jury question relating to payment of Workmen's Compensation, medical bills and disability income submitted during the jury deliberations. We consider these objections in turn.

## I. TESTIMONY CONCERNING PRIOR AND SUBSEQUENT INCIDENTS

The trial judge permitted plaintiff and other Pittsburgh Coal employees to testify about several of their abnormal experiences with Airdox shells. Plaintiff himself testified that about three weeks before the accident in question, a sudden release of air from the shell with which he was working blew some powder into his eye, not embedding anything in his skin but requiring that his eye be cleaned out. He testified that on two other occasions, once while he was about to place a shell in a new hole and once while a shell was lying unconnected on the ground, he had seen the shell "poof" or "fizz" from the release of pressurized air. Spender, another Pittsburgh Coal employee, testified that on at least one occasion several weeks after the accident, apparently because of condensation blocking the line, air was released very

---

6. If the jury found Long-Airdox entirely responsible for causing the accident, the latter would of course have no right of contribution from the Employer. On the other hand, if the jury found the Employer entirely responsible, plaintiff's suit against Long-Airdox fails and there is no recovery requiring contribution. See cases cited at notes 2–4 *supra*. The Employer was not dismissed at an earlier stage of the trial because of the possibility that Long-Airdox might introduce sufficient evidence to support a finding of joint causation.

slowly out of the bleeder valve. However, the shell was used without incident immediately after this slow bleeding. Finally, Duke, another employee, testified that several weeks after the accident he had seen an unattached Airdox shell with no apparent cause suddenly jump eighteen inches off the ground.

■ Although there was no evidence that the shells involved in these incidents were the same shell that injured plaintiff, there was testimony that each of the shells was of identical design with the suspect shell. Furthermore, aside from being direct evidence that the suspect shell was itself defective, the testimony was intended to counter defendant's contention that the shell design made impossible a misfiring caused by air retention.[7] Such a contention could best be refuted by examples to the contrary, and defendant had full opportunity to cross-examine plaintiff's witnesses to develop any significant differences in circumstances that it deemed relevant. Even now defendant does not state specifically how the differences in circumstances affect the probative value of the admittedly minor incidents to refute the defendant's general contention that the shell design made misfiring impossible.

In determining the admissibility of the testimony, we must apply Federal Rule of Civil Procedure 43(a) and give plaintiff the benefit of the more liberal of the Pennsylvania or federal rule.[8] Under the circumstances, however, we need not decide whether there is any difference between the two standards. Under both the state [9] and federal [10] standards the trial court acted within its discretion in admitting the testimony.

## II. SUFFICIENCY OF EVIDENCE TO SUPPORT JOINT CAUSATION

■ We first note that defendant does not argue that there was insufficient evidence of a defect in the Airdox shell to properly submit the question of manufacturer liability itself to the jury. Although plaintiff has the burden of showing the existence of a defect, a malfunction may itself, in the absence of abnormal use and reasonable secondary causes, be sufficient evidence of a defect to make the existence of a defect a jury question. MacDougall v. Ford Motor Co., 214 Pa.Super. 384, 257 A.2d 676 (1969); Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969). This permissible inference simply changes plaintiff's burden (in the absence of significant independent proof of a defect to one of showing the likelihood that the accident was indeed caused by a malfunction. A plaintiff can satisfy this

---

7. Defendant's counsel admitted to the court at the close of the evidence that "basically the only defense we have in this case [is] that it couldn't have happened." At no point did defendant request a statement by the judge to the jury that the other accidents were only evidence to counter defendant's defense of impossibility, rather than affirmative evidence that the shell involved in the accident was defective.

8. *See* Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392, 396–397 (5th Cir. 1972), applying Rule 43(a) to the particular point.

9. Brandon v. People's Natural Gas Co., 417 Pa. 128, 207 A.2d 843, 846–847 (1965); DiFrischia v. New York Central Ry. Co., 307 F.2d 473, 476 (3d Cir. 1962); Fenton v. McCrory Corp., 47 F.R.D. 260, 261 (W.D. Pa.1969). *Compare* Prashker v. Beech Aircraft Corp., 258 F.2d 602, 608–609 (3d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958), where statistical airplane accident reports were held inadmissible to show a design defect because of the strong possibility that the accidents were caused by pilot error. There is no contention in the present case that the other incidents were caused by external factors. *Cf.* Uitts v. General Motors Corp., 58 F.R.D. 450 (E.D.Pa.1972).

10. We find persuasive the reasoning in the following cases: Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392, 396–398 (5th Cir. 1972); Jones & Laughlin Steel Corp. v. Matherne, 348 F.2d 394, 400 (5th Cir. 1965); P.B. Mutrie Motor Transportation, Inc. v. Interchemical Corp., 378 F.2d 447, 450–451 (1st Cir. 1967). *See* Annotation, 42 A.L.R.3d 780.

burden by negating the likelihood of other reasonable causes of the accident. We doubt that in the present case plaintiff has sufficiently negated the possibility that human error caused the accident to allow the accident by itself to evidence a malfunction. *See* Woods v. Pleasant Hills Motor Co., 219 Pa.Super. 381, 281 A.2d 649, 656 (1971); Kaczmarek v. Mesta Machine Co., 463 F.2d 675 (3d Cir. 1972); Finnie v. Ford Motor Co., 331 F.Supp. 321 (W.D.Pa.1971); McMeekin v. Gimbel Bros., Inc., 223 F. Supp. 896 (W.D.Pa.1963). *See also* Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631, 640 (8th Cir. 1972).[11] We need not decide the question, however, since it is not raised on this appeal nor was it properly raised at trial.[12]

We now come to defendant's narrower point, namely that the Employer was improperly dismissed at the close of the evidence because, contrary to the trial court's finding upon which the dismissal was necessarily based, the evidence would support a finding that the accident was jointly caused by a defect in the Airdox equipment and improper human intervention at the blowdown valve.[13] After a careful review of the entire record, we agree with the trial judge that no such inference would have been permissible. The problem with such a finding of concurrent causation is that even if there were sufficient evidence in the record to support the finding of a defect, such a finding is permissible only in the *absence* of a finding of human intervention. Given a finding of human intervention at the blowdown valve, the accident does not in itself provide support for the finding of a malfunction, which is necessary to support the inference of a defect.

Nor are we persuaded that there is enough independent evidence of a defect, aside from the happening of the accident, to permit a finding of a defect concurrently with a finding of human intervention at the valve. Taylor's experiments on the suspect shell and valve were uncontradicted. Furthermore, the relatively minor incidents involving air retention by a shell, although of some probative value of a defect when combined with a permissible finding of a malfunction, are by themselves rather insubstantial evidence of a defect. None of the incidents involved the normal operational full force blast, and none therefore involved the rapid buildup of new air in a shell, as opposed to a residual release of air remaining after an explosion.[14]

11. *Compare* MacDougall v. Ford Motor Co., 214 Pa.Super. 384, 257 A.2d 676 (1969); Dennis v. Ford Motor Co., 471 F.2d 753 (3d Cir. 1973); Burchill v. Kearney-National Corp., 468 F.2d 384 (3d Cir. 1972); Kridler v. Ford Motor Co., 422 F.2d 1182 (3d Cir. 1970); Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969); Frankel v. Lull Engineering Co., 334 F.Supp. 913 (E.D.Pa. 1971), aff'd 470 F.2d 995 (3d Cir. 1973); McCann v. Atlas Supply Co., 325 F.Supp. 701 (W.D.Pa.1971); Duckworth v. Ford Motor Co., 211 F.Supp. 888 (E.D.Pa.1962), rev'd in part, 320 F.2d 130 (3d Cir. 1963).

12. It was after the jury verdict that defendant first raised the general question of sufficiency of the evidence, in its motion for a new trial or in the alternative a judgment notwithstanding the verdict. This was too late to preserve the point for appeal. Gebhardt v. Wilson Freight Forwarding Co., 348 F.2d 129 (3d Cir. 1965). We note that the question of sufficiency of the evidence to support the finding of a defect is independent of the question of sufficiency of the evidence that the product was unchanged from the time of sale to the time of the accident. Only if a defect is found at the time of the accident does the jury reach the question of whether the defect existed at the time of the sale.

13. We assume that, pursuant to a permissible finding of joint causation, a defendant liable under a strict liability theory would be entitled to contribution from a third party defendant liable under a negligence theory. This was the holding of Chamberlain v. Carborundum Co., 485 F.2d 31 (3d Cir. 1973), decided subsequent to the trial in question.

14. Defendant does not raise on appeal the further point that even if the trial court was correct in finding impermissible an inference of concurrent mechanical and human

## III. THE ASSUMPTION OF RISK DEFENSE

Defendant's counsel initially requested an assumption of risk charge on the theory that when plaintiff violated safety regulations by operating the Airdox system together with Davis, he assumed the risk that someone at the valve would prematurely explode the shell.[15] The trial judge thought the charge was superfluous, since assumption of this risk would be irrelevant under the only finding that would allow recovery, namely that the manufacturer alone caused the accident. Defendant's counsel accepted this proposition and dropped his request for an assumption of risk charge. There is no contention that the trial judge did not charge in accordance with his statement which induced counsel to drop his request. By dropping the request, defendant waived his right to allege error on appeal. Federal Rules of Civil Procedure, Rule 51; Stilwell v. Hertz Drivurself Stations, 174 F.2d 714 (3d Cir. 1949). In any event, since we agree that the evidence would not support a finding of joint causation of the accident, we also agree that an assumption of risk charge would have been superfluous for the reason stated.

## IV. OTHER CONTENTIONS OF APPELLANT

Plaintiff's expert, Dr. Weinstein, was hired to support plaintiff's original theory that the accident was due to negligent design of the Airdox equipment. When plaintiff entirely dropped the negligence theory before trial, the trial judge did not abuse his discretion in refusing to allow defendant to call plaintiff's expert as his own witness. Defendant's questioning would have inevitably distracted the jury from the primary issue by bringing up the irrelevant question of negligence.

Nor did the trial judge abuse his discretion in prohibiting defendant's counsel from asking Taylor his opinion as to the cause of the accident, since Taylor was not named as an expert as required by the pretrial rules of the court. In any event, defendant was not significantly prejudiced by the ruling, since he was allowed to present to the jury testimony of Taylor strongly implying that Taylor thought the accident was caused by human intervention.

Finally, as to the contention that the trial judge should have answered the jury's question concerning collateral medical benefits, appellant concedes that the court followed existing law. Gladden v. P. Henderson & Co., 385 F.2d 480, 483 (3d Cir. 1967), cert. denied, 390 U.S. 1013, 88 S.Ct. 1262, 20 L.Ed.2d 162 (1968).

The judgment of the district court will be affirmed.

---

causation, the court nevertheless erred by thereupon dismissing the action against the employer and submitting to the jury the sole remaining issue of manufacturer liability. We therefore decline to consider this issue. Compare the procedure followed by the trial court in Jackson v. Ulrich Manufacturing Co., 44 F.R.D. 473 (E.D.Pa.1972), aff'd 485 F.2d 680, (3d Cir. 1973) and in Grasha v. Ingersoll-Rand Co., 439 Pa. 216, 266 A.2d 710 (1970).

15. The defendant did not request an instruction that under plaintiff's evidence in support of his claim of prior malfunctions of Airdox shells plaintiff may have voluntarily assumed the risk of this alleged malfunction.